UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

---

HARVEY MILLER, individually,
and as Representative of a Class
of Participants and Beneficiaries
of the Packaging Corporation of
America Retirement Savings
Plan For Salaried Employees,

    Plaintiff,

    v.

PACKAGING CORPORATION OF
AMERICA, INC.,

    and

THE BOARD OF DIRECTORS OF
PACKAGING CORPORATION OF
AMERICA, INC.,

    and

BENEFITS ADMINISTRATION
COMMITTEE OF THE PACKAGING
CORPORATION OF AMERICA, INC.,

    and

JOHN DOES 1-30

    Defendants

Case No.

CLASS ACTION
COMPLAINT

FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)

---

COMES NOW Plaintiff, Harvey Miller, individually and as representative of a Class of Participants and Beneficiaries of the Packaging Corporation of America Retirement Savings Plan for Salaried Employees (the "Plan" or "PCA Plan"), by his counsel, WALCHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation*

to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.     Defendants, Packaging Corporation of America ("PCA"), the Board of Directors of the Packaging Corporation of America ("Board Defendants"), the Benefits Administration Committee of the Packaging Corporation of America ("Committee Defendants), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as Packaging Corporation of America Retirement Savings Plan for Salaried Employees (the "Plan" or "PCA Plan") – that it sponsors and provides to its employees.

6.     During the putative Class Period (March 23, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees [and managed account fees]," *Hughes*,142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeepers and consultants, Alight Financial Solutions, LLC, and Aon Consulting (collectively "Alight.")

7.     Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence also by "offer[ing] needlessly expensive investment options," including share classes. *See Hughes*, 142 S. Ct. at 740.

8.     These objectively unreasonable recordkeeping, managed account, and investment fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

9.     Defendants breached their fiduciary duty of prudence by offering higher cost investments to the Plan's participant when it could have offered the same investment opportunities at a lower cost, and by causing the Plan participants to pay excessive recording and managed account fees. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping, managed account, and investment services.

10.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping and managed account fees, as well as selecting and retaining investments, based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

11.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

12.     The unreasonable recordkeeping and managed account fees paid, as well as the unreasonable selection and retention of Plan investments, inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

13.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they

otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

18.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

19.     Plaintiff, Harvey Miller, is a resident of the State of Michigan and currently resides in Ludington, Michigan, and during the Class Period, was a participant and former participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff was a Shift Supervisor at the PCA Filer City Containerboard Mill facility in Filer City, Michigan from August 7, 1995, through August 12, 2014.

21.     Plaintiff has Article III standing to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive recordkeeping fees during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Alight as its recordkeeper and consultant, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

22.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injury.

23.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping, managed account, and investment fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

24.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

25.     The Packaging Corporation of America ("PCA") has approximately 15,200 employees, with operations primarily in the United States. The company's network consists of six containerboard mills, two white paper mills, ninety-five converting facilities, ten creative design centers, three fulfillment centers and eight packaging and supply centers. Its headquarters are located at 1 North Field Court, Lake Forest, IL 60045. In this Complaint, "PCA" refers to the named Defendants and all

parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

26.     PCA has six (6) facilities in Michigan, of which five (5) facilities are located in this District, including the Filer City location at which Plaintiff worked.

27.     PCA acted through its officers, including the Board of Directors ("Board Defendants") and Benefits Administration Committee ("Committee Defendants"), and their members (John Does 1-20), to perform Plan-related fiduciary functions in the course and scope of their business. PCA appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, PCA is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

28.     The Plan Administrator is the Benefits Administration Committee of the Packaging Corporation of America.  As the Plan Administrator, Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Committee Defendants have authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Committee Defendants have exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

29.     To the extent that there are additional officers and employees of PCA who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right,

once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, PCA officers and employees who are or were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

30.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that PCA's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

31.     In 2019, the Plan had about $1,143,608,015 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Alight to ensure that Alight, and the Plan investments selected, remained the prudent and objectively reasonable choice.

32.     With 5,259 participants in 2019, the Plan had more participants than 99.65% of the defined contribution plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,143,608,015 in assets in 2019, the Plan had more assets than 99.86% of the defined contribution plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE
## DEFINED CONTRIBUTION INDUSTRY

33.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

34.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

35.     Although PCA contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

36.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are thus a significant factor that affect plan participant's investment returns and impact their retirement income.

37.     Employers must consider the fees and expenses paid by a plan. Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.

38.     Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and

other plan expenses are reasonable in light of the level and quality of services pro-

vided; and (3) monitor investment options and service providers once selected to make

sure they continue to be appropriate choices.

**Recordkeeping Services**

39.     Defined contribution plan fiduciaries of mega 401(k) plans hire service

providers to deliver a retirement plan benefit to their employees. There is a group of

national retirement plan services providers commonly and generically referred to as

"recordkeepers," that have developed bundled service offerings that can meet all the

needs of mega retirement plans. Alight is one such recordkeeper.

40.     These recordkeepers deliver all the essential recordkeeping and related

administrative ("RKA") services through standard bundled offerings of the same level

and quality.

41.     There are two types of essential RKA services provided by all record-

keepers. For mega plans with substantial bargaining power (like the Plan), the first

type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of

service (meaning that the services are provided in retirement industry parlance on

an "all-you-can-eat" basis). The Bundled RKA services include, but are not limited to,

the following standard services:

a   Recordkeeping;

b   Transaction Processing (which includes the technology to process pur-
    chases and sales of participants' assets as well as providing the participants
    the access to investment options selected by the plan sponsor);

c   Administrative Services related to converting a plan from one recordkeeper
    to another recordkeeper;

d   Participant communications (including employee meetings, call cen-
    ters/phone support, voice response systems, web account access, and the
    preparation of other communications to participants, e.g., Summary Plan
    descriptions and other participant materials);

e   Maintenance of an employer stock fund (if needed);

f   Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g   Plan consulting services including assistance in selecting the investments offered to participants;

h   Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i   Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j   Compliance testing to ensure the plan complies with Internal Revenue non-discrimination rules.

42.   The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).

43.   These "Ad Hoc RKA" services typically include, but are not limited to, the following:

a   Loan processing;

b   Brokerage services/account maintenance;

c   Distribution services; and

d   Processing of Qualified Domestic Relations Orders (QDROs).

44.   For mega plans, like the PCA Plan, any minor variations in the level and quality of RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

45.   All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested,

which are treated by the recordkeepers as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RKA services.

46.    The vast majority of fees earned by recordkeepers typically come from the bundled fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

47.    Because dozens of Recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific Recordkeeper are apples-to-apples comparisons.

48.    In other words, plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

49.    Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan. And they request that the Bundled RKA revenue requirement be expressed as either a flat per participant fee rate or an asset-based fee rate, although the use of an asset-based fee structure is not a best practice.

50.    While there may be minor differences in the way the Bundled RKA services are delivered, those differences are not deemed material to the price comparisons in virtually all cases. If a specific recordkeeper provided additional services that were not offered by the other recordkeepers, and those additional services were deemed material, then the plan fiduciaries would make a downward adjustment to the price proposed by that specific recordkeeper in the amount of the value added by

the additional service to make an apples-to-apples comparison with the other record-keeping offerings. However, there are virtually never material differences in the Bundled RKA service offerings that would warrant a price adjustment.

51.    The PCA Plan had a standard package of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also service mega plans.

52.    There is nothing in the service and compensation codes disclosed by the Plan Fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the $80 annual "administrative fee" charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

53.    Accordingly, the disparity between the $80 annual "Administrative fee" and the fee paid by several other similarly sized plans for (at least) the same standard bundle of RKA services cannot be explained by any additional services.  Moreover, to the extent that additional services were provided by some providers to any Plan participants, those services were charged separately to the participants using the services and were *in addition to* the $80 annual "Administrative fee."

54.    Because recordkeepers offer the same bundles and combinations of services as their competitors, the market for defined contribution retirement plan services has become increasingly price competitive for plans that have a sizable number of participants.

55.    Over the past twenty years, the fees that recordkeepers have been willing to accept for providing retirement plan services has significantly decreased. Recordkeepers are willing (or competitively required) to accept a lower and more competitive fee as a result of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

56.    By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the PCA Plan. In other words, reasonable recordkeeping fees paid in 2019 are representative of the reasonable fees during the entire Class Period.

57.    The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.  As a plan gains more participants, the reasonable market rate for the services provided by the recordkeeper will decline.

58.    The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

59.    As a result, recordkeepers often make separate contractual arrangements with mutual fund providers. For example, recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

60.   Recordkeepers typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

61.   Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, and Plaintiff expresses no preference, the amount of compensation paid to service providers, including the recordkeepers, must be reasonable (not the *cheapest* or *average* in the market.)

62.   As a result, plan fiduciaries must understand the total dollar amounts paid to the recordkeeper and be able to determine whether the compensation is objectively reasonable by understanding the market for such recordkeeping services.

## Investments

63.   Plan Fiduciaries of a defined contribution Plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

64.   The primary purpose in selecting Plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

65.   In selecting different investment options to make available to plan participants, plan fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

66.   Accordingly, the primary focus when choosing an active investment option to make available to plan participants is the skill of the portfolio manager. In

many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes.

67.     When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, recordkeeping services.

68.     As a result, when a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary selects the share class that provides the greatest benefit to plan participants.

## Managed Account Service Fees

69.     During the Class Period, Defendants selected and made available to Plan participants managed account services.

70.     In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

71.     Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

72.     The assets of a participant signing up for a managed account service are generally managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

73.     In practice, however, there is often little to no material customization provided to the vast majority of plan participants which results in no material value to most, if not all, participants relative to the fees paid.

74.     In fact, many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

75.     Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for these services are often tiered. For example, the first $100,000 of assets may be charged a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

76.     In other words, the cost to manage the account of a participant with $100,000 is the same as the cost to manage the account of a participant with $500,000. The economies of scale for manages account services are even greater than for record-keeping.

77.     The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

78.   For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

79.   Managed account services are often offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan. In some cases, the covered service provider outsources the investment management services to a third-party provider, e.g., Morningstar, and charges a fee to the plan higher than what the third-party provider charges the covered service provider. In other cases, the covered service provider provides all the services.

80.   In many cases, the covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

81.   As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

82.   This industry segment has matured over the past decade and the costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

83.    As with retirement plan service services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

84.    The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

85.    Defendants caused Plan participants to pay excessive fees for the managed account services it made available to Plan participants by not periodically soliciting bids from other managed account service providers and/or not staying abreast of the market rates for managed account solutions to negotiate market rates.

86.    The excessive fees paid by Plan participants using the managed account service were not warranted and did not provide any material value or benefit to Plan participants.

## THE PLAN

87.    During the entire Class Period, the Plan received recordkeeping services from Alight.

88.    At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

89.    The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally

offered to mega plans, like the PCA Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500. In this case, however, as noted above, it is clear that Alight did not provide any services that were not part of the standard package of RKA services provided by all recordkeepers to all mega plans.

90.     These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

91.     During the Class Period, Defendants breached their duty of prudence owed to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

92.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

93.     A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

94.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

95.    Prudent plan fiduciaries can easily receive a quote from other record-keepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees.

96.    Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

97.    A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

98.    Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

99.    First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the record-keeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

100.    Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

101.    Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

102.    Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING FEES AND THE PLAN THUS PAID UNREASONABLE RECORDKEEPING FEES

103.    A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

104.    During the Class Period, Defendants failed to regularly monitor the Plan's recordkeeping fees paid to recordkeepers, including but not limited to Alight.

105.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable recordkeeping fees.

106.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable recordkeeping fees it paid to Alight and in light of the level and quality of recordkeeper services it received.

107.   From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RKA fees, illustrating that the Plan had on average 4,660 participants with account balances and paid an average effective annual RKA fee of at least approximately $372,760, which equates to an average of at least approximately $80 per participant. These are the minimum amounts that could have been paid:

### Recordkeeping and Administration (RKA) Fees

|  | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 2,873 | 4,153 | 5,087 | 5,207 | 5,259 | 5,378 | 4,660 |
| Est. RKA Fees | $229,840 | $332,240 | $406,960 | $416,560 | $420,720 | $430,240 | $372,760 |
| Est. RKA Per Participant | $80 | $80 | $80 | $80 | $80 | $80 | $80 |

108.   From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above).

Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500[1]

| Plan | Partici-pants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Owensboro Health 403(B) Safe Harbor Plan | 2,692 | $56,333,636 | $127,951 | $48 | Prudential | White |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retire-ment Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price | White |
| **PCA Plan For Salaried Employees Average Fee** | **4,660** | **$916,421,575** | **$372,760** | **$80** | **Alight** | **Red** |
| Healthfirst Profit Shar-ing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Children's Medical Cen-ter Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corpora-tion 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |

[1]Price calculations are based on 2018 Form 5500 information.

109.   From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the

average annual RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



110.    From the years 2015 to 2020 and based upon the best publicly available the years 2015 to 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that the Plan paid an effective average annual RKA fee of at least $80 per participant for RKA.

111.    From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $39 per participant, if not lower.

112.    From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with

similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $372,760 per year in RKA fees, which equated to an effective average of approximately $80 per participant per year.

113.   From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's participants, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately $181,721 per year in RKA fees, which equates to approximately $39 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay almost double what they could otherwise pay for RKA.

114.   From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $191,040 per year in RKA fees, which equates to on average approximately $41 per participant per year.

115.   From the years 2015 to 2020, and because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $1,146,237 in unreasonable and excessive RKA fees.

116.   From the years 2015 to 2020 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's participants, and as compared to other plans of similar sizes with similar amounts of

money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $1,666,330 in RKA fees.

117.   Defendants could have offered the exact same recordkeeping services at a lower cost by using a different recordkeeper, but did not do so.

118.   Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

119.   Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, and Defendants could have obtained the same recordkeeping services for less.

120.   The higher cost recordkeeping services selected by Defendants were substantially identical to lower-cost recordkeeping services available in the market as highlighted by the chart above.

121.   Plaintiff paid these excessive recordkeeping fees in the form of direct compensation to the Plan and suffered injuries to their Plan accounts as a result.

122.   During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RKA fees it paid to Alight.

123.   During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Alight vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

124.   During the entirety of the Class Period, Defendants knew or had

knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RKA fees it paid to Alight, but Defendants either simply failed to do so, or did so ineffectively given that it paid over 100% higher for RKA fees than it should have.

125.   During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RKA fees it paid to Alight, it would have realized and understood that the Plan was compensating Alight unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants and would have removed Alight as an imprudent choice.

126.   The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. In other words, any difference in recordkeeping fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

127.   During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher RKA fees than they should have been and/or by failing to take effective remedial actions including removing Alight as Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

128.   For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have

the investment expertise necessary to select and monitor investments under modern portfolio theory.

129.   That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager, the risk adjusted returns, and the fees.

130.   When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

131.   From the perspective of a plan participant, the other critical component of the analysis is the fees.  However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

132.   As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for recordkeeping services as well as the different fee components of the investment options selected to be made available to plan participants.

133.   Plan fiduciaries of plans as large as the Defendant's Plan are deemed to be "Institutional Investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

134.   In fact, as "Institutional Investors," retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants like Plaintiff.

135.  For example, minimum investment requirements and other fees or re-strictions are routinely waived for large retirement plans and were waived with the Plan's investments.

136.  As a result, when a plan fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants. This is especially critical when the pricing structure provides compensation to the record-keeping from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries.

137.  If a plan fiduciary chooses an active investment option, whether either a less costly active investment option or an alternative index option, the plan fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the alternative active investment option or index warrants the higher fees charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants.

138.  If a plan fiduciary chooses an active investment option when a less costly active investment option or alternative index option is available, but the plan fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and warranting the higher fees charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants, the plan fiduciary has

acted unreasonably and/or imprudently.

## THE PLAN PAID UNREASONABLY HIGH FEES
## FOR IMPRUDENT SHARE CLASSES

139.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

140.    There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

141.    It is well known among institutional investors that mutual fund companies routinely waive investment minimums for large retirement plans, and they did so with the Plan. Moreover, mega defined contribution plans such as the PCA Plan have sufficient assets to qualify for the lowest cost share classes.

142.    So, unlike individual or retail investors, retirement plan fiduciaries often have access to several different share classes.  A prudent plan fiduciary ensures that the plan selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors.

143.    As described in more detail below, choosing the share class that provides that provides the greatest benefit to plan participants is always the prudent choice because the use of the share class result in one of the following superior options: 1) the amount of the fee extraction to cover the recordkeeping fee will be lower; or 2) the amount of excess revenue being credited back to participant accounts is greater.

144.   During the Class Period, Defendants knew or should have known that they are required to select the share classes that provide the greatest benefit to plan participants.

145.   During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants.

146.   During the Class Period, in many cases Defendants did not use share classes that provide the greatest benefit to plan participants and in some cases even switched from one share class to a different share class that charged a higher price.

147.   During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants.

148.   The following charts identify Defendants' share class investments during the Class Period vis-à-vis the prudent alternatives that provide the greatest benefit to plan participants:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| DDFIX | Invesco Diversified Dividend R5 | 0.54% | 0.10% | 0.44% | LCEIX | Invesco Diversified Dividend Investor | 0.78% | 0.50% | 0.28% | 57% |
| MWTSX | Metropolitan West Total Return Bond Fund | 0.37% | 0.00% | 0.37% | MWTNX | Metropolitan West Total Return Bd Admin | 0.78% | 0.50% | 0.28% | 32% |
| MVSSX | Victory-Integrity Small Cap Value Fund R6 | 0.96% | 0.00% | 0.96% | VSVIX | Victory Integrity Small-Cap Value Y | 1.08% | 0.25% | 0.83% | 16% |
| | *Average* | *0.62%* | *0.03%* | *0.59%* | | *Average* | *0.88%* | *0.42%* | *0.46%* | *34.98%* |

149.   The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was

equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by Alight.

150.    Based upon data and information reflected in the charts above, the excessive fee paid by Participants during the Class Period as a result of Defendants' failure to use the prudent alternative share class that provided the greatest benefit to Plan Participants was approximately 33%.

151.    There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is approximately 35% higher than an alternative investment option that provides the identical services of the same portfolio manager.

152.    During the Class Period, and had Defendants engaged in an objectively reasonable search for, and selection of, the share class that provided the greatest benefit to plan participants, the Plan would have selected the fund in the chart above.

153.    During the entirety of the Class Period, Defendants knew or should have known about the existence of alternative share classes of the same mutual funds currently selected and performed the analysis to determine the share class that provides the greatest benefit to Plan participants.

154.    During the entirety of the Class Period, Defendants selected a share class that resulted in higher fees to Plan participants when a share class of the identical investment option was available that would have resulted in lower fees, to the substantial detriment of Plaintiffs and the Plan's participants.

155.    Defendants could have offered the exact same investments at a lower cost but did not do so with regard to multiple Plan investments.

156.    Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these

share class allegations are not about reasonable tradeoffs between differently managed investments. The higher cost share classes selected by Defendants were identical to those lower-cost shares class identified in the chart above.

157.   As an example, the Metropolitan West Total Return Bond Plan Fund (MWTSX), was selected by Plan fiduciaries and made available to participants in the Plan from 2015 through at least 2021.

158.   As of December 31, 2018, Plan Participants had invested more than $58,141,272 in this investment option. The portfolio managers of this investment option were Stephen M. Kane, Laird R. Landmann and Bryan T. Whalen (Kane, Landmann & Whalen). Plan participants can receive the identical portfolio management services of Kane, Landmann & Whalen through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Kane, Landmann & Whalen, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | |
|---|---|---|
| | **Metropolitan West Total Return Bd Admin** | **Metropolitan West Total Return Bond Plan Fund** |
| **Share Class** | Admin | Plan |
| **Investment Advisor** | Metropolitan West | Metropolitan West |
| **Portfolio Managers** | Stephen M. Kane, Laird R Landmann & Bryan T. Whalen | Stephen M. Kane, Laird R Landmann & Bryan T. Whalen |
| **Ticker** | MWTNX | MWTSX |
| **Portfolio Management Fee** | 0.35% | 0.35% |
| **Total Expense Ratio** | 0.78% | 0.37% |
| **Revenue Sharing Credit** | 0.50% | 0.00% |
| **Net Investment Expense to Retirement Plans** | 0.28% | 0.37% |

159.   The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was

equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by Alight.

160.    In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RKA.

161.    As a result, the fee paid for the portfolio management services of the portfolio managers Kane, Landmann & Whalen to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

162.    The Metropolitan West Total Return Bd Admin (MWTNX) has the lowest net investment expense at 0.28%. Despite the Total Expense Ratio being higher, the Metropolitan West Total Return Bd Admin (MWTNX) provides the greatest benefit to Plan participants because the 0.50% in revenue sharing that is allocable to RKA services is a credit that is returned to the participants directly or used as a credit against the RKA fee. If the 0.50% allocable to RKA services exceeds the actual RKA fee, then the excess can also be returned to the Plan and its participants.

163.    During the Class Period, Plan Participants would have received the lowest possible fee for the portfolio management services of Kane, Landmann & Whalen if invested in the Metropolitan West Total Return Bd Admin (MWTNX).

164.    When two identical service options are readily available (in this case the portfolio management services of Kane, Landmann & Whalen) and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent plan fiduciary ensures that the least expensive of those options is selected.

165.    A prudent plan fiduciary understands that the higher "sticker" price of the RKA fee portion of the expense ratio is not relevant since the RKA service provider returns excess revenue to the Plan and its participants.

166.    The DOL requires plan fiduciaries to understand all the fees related to all the various services provided to the Plan and its participants. By selecting an

investment option that charges more for identical portfolio management services, the Plan fiduciaries breached their duty of prudence.

167.   A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, would have identified the share class that provided the greatest benefit to Plan Participants, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

168.   During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on a quarterly basis; 2) did not identify the prudent share classes available to the Plan; and 3) did not transfer the Plan's investments into this prudent share class at the earliest opportunity.

169.   During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to the Plan's Participants through 2020 in the amount of approximately $365,887 and as detailed in the following chart:

| Actual Investment Lineup | | | | | | |
|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
| Net Investment Expense to Retirement Plans | $1,278,784 | $1,407,829 | $2,120,535 | $2,017,994 | $2,225,322 | $2,878,658 |
| Prudent Alternative Share Class | | | | | | |
| Net Investment Expense to Retirement Plans | $1,254,430 | $1,371,248 | $2,061,733 | $1,922,801 | $2,218,441 | $2,872,375 |
| Est. Investment Damages | $24,354 | $36,581 | $58,802 | $95,193 | $6,881 | $6,283 |
| Compounding Percentage (VIIIX) | | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% |
| Est. Cumulative Investment Damages | $24,354 | $63,845 | $136,578 | $225,748 | $303,694 | $365,887 |

170.   During the entirety of the Class Period, and by failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes

that resulted in lower fees to Plan participants was available for the same invest-ment, and/or by failing to take effective remedial actions as described herein, Defend-ants breached their fiduciary duties of prudence to Plaintiff and the Plan partici-pants.

## DEFENDANTS' INVESTMENTS IN THE PLAN

171. A prudent fiduciary will consider all plan investments, including "suit-able index mutual funds or market indexes (with such adjustments as may be appro-priate)." Restatement (Third) of Trusts § 100 cmt. b(1).

172. *Hughes v. Northwestern Univ.* holds that every investment on an ERISA plan's menu must be prudent, and "participants' ultimate choice over their investments [does not] excuse allegedly imprudent decisions by [fiduciaries]." 142 S. Ct. at 742.

173. During the Class Period, the chart below identifies several investment options that Defendants selected and/or made available to Plan Participants as com-pared to prudent alternative and less expensive options.

| Defendants' Investment | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| DDFIX | Invesco Diversified Dividend R5 | 0.54% | 0.10% | 0.44% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 57% |
| - | Boston Partners Large Cap Value Fund Class D | 0.42% | 0.00% | 0.42% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 50% |
| RERGX | EuroPacific Growth Fund | 0.49% | 0.00% | 0.49% | VWILX | Vanguard International Growth Adm | 0.32% | 0.00% | 0.32% | 53% |
| LSVNX | Loomis Sayles Value Fund | 0.57% | 0.00% | 0.57% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 104% |
| FBNRX | Templeton Global Bond Fund R6 | 0.57% | 0.00% | 0.57% | DODLX | Dodge & Cox Global Bond | 0.45% | 0.08% | 0.37% | 54% |
| MVSSX | Victory-Integrity Small Cap Value Fund R6 | 0.96% | 0.00% | 0.96% | FRCSX | Franklin Small Cap Value R6 | 0.63% | 0.00% | 0.63% | 52% |
| | *Average* | *0.59%* | *0.02%* | *0.58%* | | *Average* | *0.37%* | *0.01%* | *0.36%* | *61.71%* |

174.    During the Class Period and based on the charts above, the average net investment expense of the investments selected and made available to Plan participants by the Plan fiduciaries identified above was 0.58%, or 58 basis points.

175.    During the Class Period and based on the charts above, the investment options selected by the Plan fiduciaries were 61.71% more expensive than prudent alternative and less expensive options covering the same asset category.

176.    During the Class Period, Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

177.    During the Class Period and had Defendants been acting in the best interests of the Plan's participants, Defendants would have selected funds with lower expense ratios than those funds actually selected by Defendants, such as the ones identified in the chart above.

178.    During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

179.    During the Class Period, Plaintiffs had no knowledge of how the fees charged to and paid by the Plan participants compared to any other funds.

180.    During the Class Period, Plaintiffs did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants failed to reasonably offer because Defendants provided no comparative information to allow Plaintiffs to evaluate and compare Defendants' investment options.

181.    During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with Alight, thereby paying fees that were more than necessary to the detriment of Plaintiffs and the Plan's participants.

182.    During the Class Period and had Defendants chosen investment options similar or identical to the comparator funds identified above, the Plan's participants

would have been received the exact same portfolio management services but at a lower cost.

183.    During the Class Period and because Defendants imprudently chose investment options that were not similar or identical to the lower cost comparator funds identified above, Defendants caused unreasonable and unnecessary losses to Plaintiffs and Plan's participants.

184.    During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2015 to 2020 were more expensive by significant multiples of comparable actively managed, alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

185.    During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of higher-cost funds, Plaintiffs and the Plan's participants incurred objectively unreasonable actual expenses and costs.

186.    During the Class Period and had Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have prudently chosen lower-cost investment alternatives.

187.    During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiffs and the Plan's participants in the amount of approximately $1,138,821 through 2020 and as detailed in the following chart:

| Actual Investment Lineup | | | | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Net Investment Expense to Retirement Plans** | $1,278,784 | $1,407,829 | $2,120,535 | $2,017,994 | $2,225,322 | $2,878,658 |
| **Prudent Alternative Investments** | | | | | | |
| **Net Investment Expense to Retirement Plans** | $1,178,581 | $1,294,476 | $1,953,661 | $1,903,599 | $2,087,052 | $2,738,868 |
| **Est. Investment Damages** | $100,203 | $113,353 | $166,874 | $114,394 | $138,270 | $139,791 |
| **Compounding Percentage (VIIIX)** | | 11.95% | 21.82% | -4.41% | 31.48% | 18.41% |
| **Est. Cumulative Investment Damages** | $100,203 | $225,531 | $441,615 | $536,534 | $843,705 | $1,138,821 |

188.   The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's participant fee disclosures.

189.   During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments, Defendants breached their fiduciary duties of prudence to Plaintiff and Plan participants.

**THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR
MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT,
THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES**

190.   Defendants retained Alight's wholly-owned subsidiary, Alight Financial Advisors ("AFA") to provide its own Professional Management Program ("PMP") to provide managed account services to the Plan.

191.   For this service, up through at least the end of 2020, Defendants have allowed Plan participants to pay an annual fee of at least 0.60% on the

first $100,000, 0.45% on the next $150,000, and 0.30% on assets greater than $250,000.

192.   Companies are not required to publicly disclose the fee rates for managed account services making it difficult to obtain marketplace data. That said, the table below illustrates the fee rates paid by similarly situated plans for materially identical managed account services.

| Managed Account service fee rates of similarly situated plans | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| PCA "Professional Management Program" | 0.60% | 0.45% | 0.30% |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

193.   As illustrated above, in all cases, the participants in the other comparator plans are paying fee rates at every tier lesser than Plan participants.

194.   A number of other managed account providers exist whose services are virtually identical to the services provided to Plan participants through the "Professional Management" service and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the PCA Plan.

195.   Similarly, the Kimberly-Clark 401(k) Profit Sharing and Retirement Plan, a similar mega Plan to PCA, provided in 2020 managed account services through Fidelity to its participants at a much lower price on the following schedule: no fee up to the first $5000, 0.25% up to $100,000, 0.15% on the next $150,000, and 0.10% on assets greater than $250,000.

196.   As a result, it is clear that the fee rates paid by the Plan participants for

the PMP was excessive and objectively unreasonable given the Plan's size and nego-
tiating power.

197.    The services provided by managed account service providers are mate-
rially identical at the mega plan level.  All these managed account services offer "[t]o
help . . . create an investment strategy, . . . and to provide fiduciary investment ser-
vices to plan participants." AFA also offers, like all other managed account service
providers at this level, through its PMP, "[a]n Online Advice tool can help [partici-
pants] fine-tune [their] investing strategy, and the Professional Management pro-
gram offers personalized portfolio management from professional investment advi-
sors."

198.    Defendants could have offered the exact same managed account services
at a lower cost by using a different managed account provider, but did not do so.

199.    Although the United States Supreme Court noted in *Hughes* that "[a]t
times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs,
and courts must give due regard to the range of reasonable judgments a fiduciary
may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these
managed account allegations are not about reasonable tradeoffs between managed
account service providers offering a different level or quality of services.

200.    Rather, Defendants failed to take advantage of the Plan's size to timely
negotiate lower fees from its existing managed account service provider, and Defend-
ants could have obtained the materially same managed account services for less
through another provider if it had solicited competitive bids for the same services.

201.   The higher cost managed account services selected by Defendants were substantially identical to lower-cost managed account services available in the market as highlighted by the chart above.

202.   The Plan's PMP managed account service also added no material value to participants to warrant the additional fees. In most cases, the asset allocation created by the PMP was not materially different than the asset allocation of the age appropriate target date option made available to the Plan's participants at a much lower fee.

203.   As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

204.   As a result, based on the value provided, the reasonable fee for Plan's PMP was zero or very close to zero.

205.   Defendants did not prudently evaluate the incremental value provided by the Plan's PMP managed account service to determine that the fees were warranted.

206.   A prudent fiduciary would have conducted periodic competitive solicitations (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for managed account services were reasonable. Had Defendants done so, Plaintiff and Plan participants would not have paid the excessive managed account service fees that it did.

207.   Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

208.   Defendants' failure to properly monitor or control fees for the Plan's managed account service cost resulted in Plan participants paying excessive and objectively unreasonable fees and constitutes a separate and independent breach of the fiduciary duty of prudence.

## CLASS ACTION ALLEGATIONS

209.   29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

210.   In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

All participants and beneficiaries of the Packaging Corporation of America Retirement Savings Plan for Salaried Employees (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning March 23, 2016 and running through the date of judgment.

211.    The Class includes over 5,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

212.    There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

a    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

b    Whether Defendants breached their fiduciary duties to the Plan;

c    What are the losses to the Plan resulting from each breach of fiduciary duty; and

d    What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

213.    Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

214.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class

period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

215.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

216.   Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

217.   Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

218.   The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

219.    The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

220.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

221.    Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class, Against Committee Defendants – Recordkeeping Fees)

222.    Plaintiff restates the above allegations as if fully set forth herein.

223.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

224.    29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

225.   Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

226.   During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

227.   During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's recordkeeping fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

228.   During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

229.   During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

230.   Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

231.   Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

232.   As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

233.   Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the PCA Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

### SECOND CLAIM FOR RELIEF
### Breaches of Duty of Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class, Against Committee Defendants – Investment Management Fees)

234.   Plaintiff restates the above allegations as if fully set forth herein.

235.   Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

236.   29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in managing the investments, including share classes, of the Plan.

237.   Committee Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

238.   During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

239.   During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

240.   Committee Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

241.   During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to engage

in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

242.   Committee Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis, eliminating funds or share classes that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

243.   Committee Defendants failed to employ a prudent process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other more reasonable investment options. Committee Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

244.   Committee Defendants failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

245.   As a result of Committee Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

246.    Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Committee Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class, Against Committee Defendants – Managed Account Service Fees)

247.    Plaintiff restates the above allegations as if fully set forth herein.

248.    Defendant Committee is a fiduciary of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

249.    29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendant Committee in their administration of the Plan.

250.    Defendant Committee, as fiduciary of the Plan, is responsible for selecting a managed account service provider that charges reasonable managed account service fees.

251.    During the Class Period, Defendant Committee had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

252. During the Class Period, among other things, Defendant Committee imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

253. During the Class Period, Defendant Committee further had a continuing duty to regularly monitor and evaluate the Plan's managed account provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

254. During the Class Period, Defendant Committee breached its duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's managed account provider in comparison to other managed account options.

255. Defendant Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

256. As a result of Defendant Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff, and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

257. Defendant Committee is liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan

any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

<b>FOURTH CLAIM FOR RELIEF</b><br>
<b>Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended</b><br>
<b>(Plaintiff, on behalf of himself and Class, Against Defendant PCA and Defendant</b><br>
<b>Board – Recordkeeping Fees)</b>

258.    Plaintiff restates the above allegations as if fully set forth herein.

259.    Defendants PCA and Board had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

260.    In light of this authority, Defendants PCA and Board had a duty to monitor those individuals responsible for Plan recordkeeping fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

261.    Defendants PCA and Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

262.   The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants PCA and Board breached their duty to monitor by, among other things:

a   Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

b   Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c   Failing to remove individuals responsible for Plan recordkeeping fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

263.   As the consequences of the foregoing breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

264.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants PCA and Board are liable to restore to the PCA Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

### FIFTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Defendant PCA and Defendant
Board – Investment Management Fees)**

265.    Plaintiff restates the above allegations as if fully set forth herein.

266.    Defendants PCA and Board had the authority to appoint and remove members or individuals responsible for Plan investment management fees, and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

267.    In light of this authority, Defendants PCA and Board had a duty to monitor those individuals responsible for Plan investment management fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

268.    Defendants PCA and Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

269.   The objectively unreasonable and excessive investment management fees paid by the Plan inferentially suggest that Defendants PCA and Board breached their duty to monitor by, among other things:

a    Failing to monitor and evaluate the performance of individuals responsible for Plan investment management fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably investment management expenses;

b    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced investment management fees; and

c    Failing to remove individuals responsible for Plan investment management fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same investment management costs even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

270.   As the consequences of the foregoing breaches of the duty to monitor for investment management fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

271.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants PCA and Board are liable to restore to the PCA Plan all loses caused by their failure to adequately monitor individuals responsible for Plan investment management fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## SIXTH CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended (Plaintiff, on behalf of himself and Class, Against Defendant PCA and Defendant Board – Managed Account Fees)**

272.   Plaintiff restates the above allegations as if fully set forth herein.

273.   Defendants PCA and Board had the authority to appoint and remove members or individuals responsible for Plan managed account fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

274.   In light of this authority, Defendants PCA and Board had a duty to monitor those individuals responsible for Plan managed account fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

275.   Defendants PCA and Board had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

276.    The objectively unreasonable and excessive managed account fees paid by the Plan inferentially suggest that Defendants PCA and Board breached their duty to monitor by, among other things:

a    Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees and fee disclosures or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account expenses;

b    Failing to monitor the process by which the Plan's recordkeeper was evaluated and failing to investigate the availability of more reasonably-priced managed account providers; and

c    Failing to remove individuals responsible for Plan managed account fees and fee disclosure whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining AFA as the managed account provider at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

277.    As the consequences of the foregoing breaches of the duty to monitor for managed account fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

278.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants PCA and Board are liable to restore to the PCA Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.   A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.   A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable recordkeeping, managed account, and investment management costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.   An Order requiring Defendant PCA to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against PCA as necessary to effectuate relief, and to prevent PCA's unjust enrichment;

F.   An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 23rd day of March, 2022

s/ Paul M. Secunda
*James A. Walcheske, WI Bar No. 1065635
*Scott S. Luzi, WI Bar No. 1067405
Paul M. Secunda, WI Bar No. 1074127
*Pro Hac Vice Applications Pending
WALCHESKE & LUZI, LLC
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

Troy W. Haney (P48614)
HANEY LAW FIRM, P.C.
330 East Fulton Street
Grand Rapids, MI 49503
Telephone: (616) 235-2300
Fax: (616) 459-0137
E-Mail: thaney@troyhaneylaw.com

Attorneys for Plaintiff