UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HARVEY MILLER, individually,
and as Representative of a Class
of Participants and Beneficiaries
of the Packaging Corporation of
America Retirement Savings
Plan For Salaried Employees,

        Plaintiff,

        v.

PACKAGING CORPORATION OF
AMERCIA, INC.,

        and

THE BOARD OF DIRECTORS OF
PACKAGING CORPORATION OF
AMERCIA, INC., MARK W.
KOWLZAN, CHERYL K. BEEBE,
DUANE FARRINGTON, DONNA A.
HARMAN, ROBERT C. LYONS,
THOMAS P. MAURER, SAMUEL M.
MENCOFF, ROGER B. PORTER,
THOMAS A. SOULELES, AND
PAUL T. STECKO

        and

INVESTMENT COMMITTEE OF THE
PACKAGING CORPORATION OF
AMERCIA, INC., MICHELLE WOJDYLA,
ROBERT P. MUNDY, AND PAMELA A.
BARNES

        Defendants

Case No: 1:22-cv-00271

Judge Hala Y. Jarbou

Magistrate Judge Ray Kent

CLASS ACTION
AMENDED COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)

COMES NOW Plaintiff, Harvey Miller, individually and as representative of a Class of Participants and Beneficiaries of the Packaging Corporation of America Retirement Savings Plan for Salaried Employees (the "Plan" or "PCA Plan"), by his counsel, WALCHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and asserts to the best of his knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1. Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2. The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3. The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4. Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fidu-

ciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5.      Defendants, Packaging Corporation of America ("PCA"), the Board of Directors of the Packaging Corporation of America ("Board Defendants"), including individual Directors, Mark W. Kowlzan, Cheryl K. Beebe, Duane Farrington, Donna A. Harman, Robert C. Lyons, Thomas P. Maurer, Samuel M. Mencoff, Roger B. Porter, Thomas A. Souleles, and Paul T. Stecko, and the Investment Committee of the Packaging Corporation of America, including individual members Michelle Wojdyla, Robert P. Mundy, and Pamela A. Barnes ("Committee Defendants) (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as Packaging Corporation of America Retirement Savings Plan for Salaried Employees (the "Plan" or "PCA Plan") – that it sponsors and provides to its employees.

6.      During the putative Class Period (March 23, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees [and managed account fees]," *Hughes*,142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeepers and consultants, Alight Financial Solutions, LLC, and Aon Consulting (collectively "Alight").

7.      Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached their fiduciary duty of prudence also by

"offer[ing] needlessly expensive investment options," including unnecessary, high-cost share classes. *See Hughes*, 142 S. Ct. at 740.

8. These objectively unreasonable recordkeeping, managed account, and investment fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

9. Defendants breached their fiduciary duty of prudence by offering higher cost investments to the Plan's participant when it could have offered the same investment opportunities at a lower cost, and by causing the Plan participants to pay excessive recording and managed account fees. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping, managed account, and investment services.

10. ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping and managed account fees, as well as selecting and retaining investments, based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

11. There is no requirement to allege the actual inappropriate fiduciary actions taken because "a breach of fiduciary duty claim under ERISA can survive a motion to dismiss without 'well-pleaded factual allegations relating directly to the methods. employed by the ERISA fiduciary if the complaint alleges facts that, if proved, would show that an adequate investigation would have revealed to a reasonable fiduciary that the investment at issue was improvident." *Comau LLC v. Blue Cross Blue Shield of Michigan*, 2020 WL 7024683, at *7 (E.D. Mich. Nov. 30, 2020) (quoting *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013)).

12. The unreasonable recordkeeping and managed account fees paid, as well as the unreasonable selection and retention of Plan share classes and investments, inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

13. These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14. To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

### JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

16. This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

18. In conformity with 29 U.S.C. § 1132(h), Plaintiff served the initial Complaint on the Secretary of Labor and the Secretary of the Treasury.

<u>PARTIES</u>

19.     Plaintiff, Harvey Miller, is a resident of the State of Michigan and currently resides in Ludington, Michigan, and during the Class Period, was a participant and former participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff was a Shift Supervisor at the PCA Filer City Containerboard Mill facility in Filer City, Michigan from August 7, 1995, through August 12, 2014.

21.     Plaintiff was a participant in the Plan through August 17, 2016 and paid excessive recordkeeping fees during the first two quarters of 2016. During the Class Period, Plaintiff held investments in the State Street Target Retirement Date 2020 and 2025 Funds, PCA Common Stock Fund, and EuroPacific Growth Fund.

22.     Plaintiff has Article III standing as both a current and former Plan participant to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive recordkeeping fees during the first two quarters of 2016 during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Alight as its recordkeeper and consultant, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

23.     "Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; when that injury is caused by the defendant's acts; and when a judicial decision in the plaintiff's favor would redress that injury." *See Brandt v. Vill. of Winnetka, Illinois*, 612 F.3d 647, 649 (7th Cir. 2010) (citing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009); *Steel Co.*, 523 U.S. at 102–04 (1998)). Because Plaintiff has alleged an injury to his own account, Plaintiff has standing, no matter how small his injuries. *See Nohara v. Prevea Clinic Inc.*, No. 20-C-1079, 2022 WL 1504925, at *2 (E.D. Wis. May 12, 2022).

24. Although Plaintiff is a former participant in the Plan, he "has partici-pant standing under Section 502(a)(2) because [he] still retains a colorable claim for vested benefits. For instance, in the event that [his] lawsuit on behalf of the Plan is successful, a restoration of benefits back to the Plan would result in a financial benefit to individual participants. Thus, Plaintiff sufficiently meets the requirements for statutory standing un-der ERISA §502(a)(2)." *See Allison v. L Brands, Inc.,* No. 2:20-CV-6018, 2021 WL 4224729, at *3 (S.D. Ohio Sept. 16, 2021.) Plaintiff also "satisfies the requirements necessary to es-tablish constitutional standing." *Id.* at *4.

25. Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps be-yond his own injury, including for: excessive managed account services fees, high-cost share classes he did not hold, high-cost investments he did not hold, and for time periods when he was not a participant in the Plan.

26. The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive recordkeeping, managed ac-count, and investment fees) necessary to understand that Defendants breached their fiduci-ary duty of prudence until shortly before this suit was filed.

27. Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

28. The Packaging Corporation of America ("PCA") has approximately 15,200 em-ployees, with operations primarily in the United States. The company's network consists of

six containerboard mills, two white paper mills, ninety-five converting facilities, ten creative design centers, three fulfillment centers and eight packaging and supply centers. Its headquarters are located at 1 North Field Court, Lake Forest, IL 60045. In this Complaint, "PCA" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

29. PCA has six (6) facilities in Michigan, of which five (5) facilities are located in this District, including the Filer City location at which Plaintiff worked.

30. PCA acted through its officers, including the Board of Directors and its individual Directors ("Board Defendants"), and the Investment Committee and its individual Members ("Committee Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. PCA appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, PCA is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

31. The Plan Administrator is the Investment Committee of the Packaging Corporation of America and its individual members, including Defendants Wojdyla, Mundy, and Barnes (collectively "Committee Defendants"). As the Plan Administrator, Committee Defendants are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Committee Defendants have exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

32. To the extent that there are additional officers and employees of PCA who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers or consultants for the Plan during the Class Period, the identities of

whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.

33. The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that PCA's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

34. In 2019, the Plan had about $1,143,608,015 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Alight to ensure that Alight, and the Plan investments selected, remained the prudent and objectively reasonable choice.

35. With 5,259 participants in 2019, the Plan had more participants than 99.65% of the defined contribution plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $1,143,608,015 in assets in 2019, the Plan had more assets than 99.86% of the defined contribution plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

36. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

37. Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

38. Although PCA contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

39. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

40. Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices.

<u>Recordkeeping Services</u>

41. Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with same level and caliber of services. Alight is one such recordkeeper.

42. These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality as other recordkeepers who service mega plans.

43.     There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RKA services include, but are not limited to, the following standard services:

a.      Recordkeeping;

b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.      Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.      Maintenance of an employer stock fund;

f.      Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.      Plan consulting services including assistance in selecting the investments offered to participants;

h.      Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.      Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.      Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

44. The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "Ad Hoc RKA" services typically include, but are not limited to, the following:

   a.    Loan processing;

   b.    Brokerage services/account maintenance;

   c.    Distribution services; and

   d.    Processing of Qualified Domestic Relations Orders (QDROs).

45. For mega plans, like the PCA Plan, any minor variations in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

46. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

47. The vast majority of fees earned by recordkeepers typically come from the fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

48. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

49. Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by record-keepers.

50. Plan fiduciaries request bids from recordkeepers by asking what the record-keeper's Bundled RKA revenue requirement is to administer the plan.

51. The PCA Plan had a standard level of Bundled RKA services, providing record-keeping and administrative services of a nearly identical level and quality to other record-keepers who also serviced mega plans during the Class Period.

52. There is nothing in the service and compensation codes disclosed by the Plan fiduciaries in their Form 5500 filings during the Class Period, nor anything disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the $80 annual "administrative fee" charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

53. The Plan fee disclosures state that the $80 fee only covers "trustee, legal, recordkeeping, and accounting services."

54. The disparity between the $80 annual "administrative fee" and the fee paid by several other similarly sized plans for the same standard bundle of RKA services cannot be explained by any "additional services".

55. To the extent that additional services were provided by some providers to any Plan participants, those services were charged separately to the participants using the ser-vices and were *in addition to* the $80 annual "Administrative fee".

56. By the start of, and during the entire Class Period, the level of fees that record-keepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the PCA Plan.

57. Reasonable recordkeeping fees paid in 2019 are representative of the reasonable fees during the entire Class Period.

58. The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

59. The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

60. Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

61. The PCA Plan paid revenue sharing to Alight, as disclosed on the Plan's Form 5500 forms during the Class Period.

62. The amount of compensation paid to recordkeepers must be *reasonable* (not the cheapest or the average in the market).

63. Reasonable, in turn, depends on contextually understanding the market for such recordkeeping services at the time that the recordkeeping contract is entered into.

**Investments and Share Classes**

64. Plan fiduciaries of a defined contribution plan have a continuing and regular duty of prudence to monitor all investment options they make available to Plan participants on a regular basis and remove imprudent ones.

65. The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

66. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

67. Accordingly, the primary focus when choosing an active investment option to make available to plan participants is the skill of the portfolio manager.

68. In many cases, a plan sponsor can receive the investment management services of the same portfolio manager through different share classes.

69. When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes.

70. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, recordkeeping services through revenue sharing.

71. When a prudent plan fiduciary can select from among several alternative share classes of the identical investment option, the prudent plan fiduciary should select the share class that provides the greatest benefit to plan participants in the form of having the lowest *net* expense, which is the expense ratio minus revenue sharing.

72. CapTrust, one of the largest providers of fiduciary services to retirement plan sponsors, specifically identifies on its website a fiduciary "pitfall" is "benchmarking only the total expense ratio" and failing to consider the net expense, i.e., "expense ratio minus revenue sharing" pointing out that, "what should be compared to the investment managers of that same asset class or category is expense ratio minus revenue sharing." See CapTrust Website, Understanding and Evaluating Retirement Plan Fees|Part Two: Benchmarking

Investment Fees, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-two- benchmarking-investment-fees/.

<u>Managed Account Services</u>

73. During the Class Period, Defendants selected and made available to Plan participants managed account services.

74. In general, managed account services are investment services under which a participant pays a fee to have a managed account provider invest his account in a portfolio of preselected investment options.

75. Managed account providers "generally offer the same basic service—initial and ongoing investment management of a 401(k)-plan participant's account based on generally accepted industry methods." The United States Government Accountability Office ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 14 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

76. The assets of a participant signing up for a managed account service are managed based upon a program designed by the managed account provider that purportedly customizes the participant's portfolio based upon factors such as their risk tolerance and the number of years before they retire.

77. In practice, there is often little to no material customization provided to the vast majority of plan participants which results in no material value to most, if not all, participants relative to the fees paid.

78. Many managed account services merely mimic the asset allocations available through a target date fund while charging additional unnecessary fees for their services.

79. Participants who sign up for managed account services are generally charged an annual fee that is a percentage of the participant's account balance. The fee rates for

these services are often tiered. For example, the first $100,000 of assets may be charged a certain fee rate, the next $150,000 in assets at a lower fee rate, and all remaining assets at a still-lower fee rate. This is appropriate because the marginal cost to manage the additional assets for the participant is essentially $0.

80. The cost to manage the account of a participant with $100,000 is the same as the cost to manage the account of a participant with $500,000.

81. The participant has no control over the fee rate they are charged if they use the managed account service. The fee levels are determined at the plan level through a contractual agreement between the managed account provider and plan fiduciaries.

82. For at least the past decade, mega plans have been able to negotiate multiple facets of the fees charged by managed account providers such as both the asset levels at which a particular fee tier starts (e.g., the highest tier applies to the first $25,000 versus the first $100,000), as well as the fee rate charged at each asset level.

83. Managed account services are often offered by covered service providers to increase the revenue they generate through their relationship with a retirement plan.

84. In many cases, the covered service provider will promote the managed account services over other potential solutions because the covered service provider will earn more revenue when participants use the managed account services.

85. As with any service provider, one of the most important factors when selecting a managed account provider is fees. Managed account services have historically been expensive compared to other alternatives, such as target date funds that provide the materially same service (e.g., an automated time-based dynamic asset allocation creation and rebalancing solution).

86. The costs of providing managed account services have declined and competition has increased. As a result, the fees providers are willing to accept for managed account services have been declining for many years.

87. As with retirement plan service services, prudent fiduciaries will regularly monitor the amount of managed account service fees the plan is paying and will ensure the fees are reasonable compared to what is available in the market for materially similar services.

88. The most effective way to ensure a plan's managed account service fees are reasonable is to periodically solicit bids from other managed account service providers, stay abreast of the market rates for managed account solutions, and/or negotiate most-favored nation clauses with the managed account service providers and/or the recordkeepers.

89. Defendants caused Plan participants to pay excessive fees for the managed account services it made available to Plan participants by not periodically soliciting bids from other managed account service providers and/or not staying abreast of the market rates for managed account solutions to negotiate market rates.

## THE PLAN

90. During the entire Class Period, the Plan received recordkeeping services from Alight.

91. At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants.

92. The fees were also excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega

plans, like the PCA Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

93. These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

94. During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

95. Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

### STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

96. A plan fiduciary is required to fully understand all sources of revenue received by its recordkeeper. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the quality and level of services provided.

97. Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.

98. Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

99. Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

100. A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

101. Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

102. First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

103. Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct com-pensation and revenue sharing being paid to the plan's recordkeeper.

104. Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

105.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

**PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR
RECORDKEEPING FEES AND THE PLAN THUS PAID
UNREASONABLE RECORDKEEPING FEES**

106.     A plan fiduciary must continuously monitor its recordkeeping fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

107.     During the Class Period, Defendants failed to regularly monitor the Plan's Bundled RK&A fees paid to recordkeepers, including but not limited to Alight.

108.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable Bundled RK&A fees.

109.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable Bundled RK&A fees it paid to Alight and in light of the level and quality of recordkeeper services it received.

110.     From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual Bundled RK&A fees illustrating that the Plan had on average 5,017 participants with account balances and paid an average effective annual Bundled RK&A fee of at least approximately $401,344, which equates to an average of at least approximately $80 per participant. These are the minimum amounts that could have been paid:

## Recordkeeping and Administration (RKA)

| | 2016 | 2017 | 2018 | 2019 | 2020 | Average |
|---|---|---|---|---|---|---|
| Participants | 4,153 | 5,087 | 5,207 | 5,259 | 5,378 | 5,017 |
| Est. RKA Fees | $332,240 | $406,960 | $416,560 | $420,720 | $430,240 | $401,344 |
| Est. RKA Per Participant | $80 | $80 | $80 | $80 | $80 | $80 |

111.    From the years 2016 through 2020, the table below illustrates the annual Bundled RK&A fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RK&A fees paid by the Plan:

### Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500[1]

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Owensboro Health 403(B) Safe Harbor Plan | 2,692 | $56,333,636 | $127,951 | $48 | Prudential | White |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard | White |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price | White |
| PCA Plan Average Fee | 5,017 | $1,003,594,604 | $401,344 | $80 | Alight | Red |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard | White |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |

[1]Price calculations are based on 2018 Form 5500 information.

112. From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual Bundled RK&A fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual Bundled RK&A fees paid by the Plan (as identified in the table above), with the white data points representing Bundled RK&A fees that RKA providers offered to (and were accepted by) comparable Plans.



113. From the years 2016 to 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that the Plan paid an effective average annual Bundled RK&A fee of at least $80 per participant.

114. The regression line (dotted line in the chart above) represents a reasonable estimate of the market rate for Bundled RK&A fees during the Class Period that prudent plan fiduciaries could obtain from mega recordkeepers if they had followed a prudent process.

115. From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Bundled RK&A fee of around $39 per participant, if not lower.

116. From the years 2015 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $401,344 per year in Bundled RK&A fees, which equated to an effective average of approximately $80 per participant per year.

117. From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for Bundled RK&A of approximately $195,655 per year, which equates to approximately $39 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay almost double what they could otherwise pay for RKA.

118. From the years 2016 through 2020 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $205,689 per year in Bundled RK&A fees, which equates to on average approximately $41 per participant per year.

119. From the years 2016 to 2020, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $1,028,444 in unreasonable and excessive Bundled RK&A fees.

120. From the years 2016 to 2020 based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $1,427,261 in Bundled RK&A fees.

121. Defendants could have offered the exact same recordkeeping services at a lower cost by using a different recordkeeper but did not do so.

122. Defendants could have received recordkeeping services during the Class Period of the same level and quality from Alight or other recordkeepers that provide recordkeeping services to mega plan, like the PCA plan, because both the Plan 5500 forms and Plan fee disclosures to participants establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the plan received any additional services.

123. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these recordkeeping allegations are not about reasonable tradeoffs between recordkeepers providing a different level or quality of services.

124. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeeper, Alight, and Defendants could have obtained the same Bundled RK&A services for less.

125. Plaintiff paid these excessive Bundled RK&A fees for half of 2016 ($40) in the form of direct compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

126. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's Bundled RK&A fees it paid to Alight.

127. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RK&A fees it paid to Alight vis-à-vis the fees that other RK&A providers would charge, and would have accepted, for the same level and quality of services.

128. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RK&A fees it paid to Alight, but Defendants either simply failed to do so, or did so ineffectively given that it paid over 100% higher for Bundled RK&A fees than

it should have.

129.    During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Bundled RK&A fees it paid to Alight, it would have realized and understood that the Plan was compensating Alight unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants and would have removed Alight as an imprudent choice.

130.    The Plan Bundled RK&A fees were also excessive relative to the services received, since the quality and level of such services are standard for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in Bundled RK&A fees between comparable plans is not explained by the level and quality of services each recordkeeper provides.

131.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RK&A fees than they should have been and/or by failing to take effective remedial actions including removing Alight as Plan recordkeeper, Defendants breached their fiduciary duty of prudence to Plaintiffs and Plan participants, costing them millions of dollars in lost of retirement savings.

<u>STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING<br>& MONITORING INVESTMENT OPTIONS</u>

132.    For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard.

133.    That accepted process involves, among other things, evaluating the perfor-

mance history, tenure, and stability of the current portfolio manager, the risk adjusted returns, and the fees.

134. When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

135. From the perspective of a plan participant, the other critical component of the analysis is the fees. The total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

136. As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for recordkeeping services as well as the different fee components of the investment options selected to be made available to plan participants.

137. Plan fiduciaries of plans as large as the Defendant's Plan are deemed to be "institutional investors" and are deemed to have a higher level of knowledge and understanding of the different investment share classes and the different components of fees within the total expense ratio of an investment option.

138. As "institutional investors," retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants like Plaintiff.

139. For example, minimum investment requirements and other fees or restrictions are routinely waived for large retirement plans and were waived with the Plan's investments.

140. As a result, when a plan fiduciary can choose among different share classes

(or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different share classes and collective trusts and choose the share class or collective trust that is in the best interest of the plan participants.

141. This process is especially critical when the pricing structure provides compensation to the recordkeeping from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries, like it did in the PCA Plan.

142. If a plan fiduciary chooses an active investment option, whether either a less costly active investment option or an alternative index option, the plan fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the alternative active investment option or index warrants the higher fees charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants.

143. If a plan fiduciary chooses an active investment option when a less costly active investment option or alternative index option is available, but the plan fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and warranting the higher fees charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of plan participants, the plan fiduciary has acted unreasonably and/or imprudently.

<u>THE PLAN PAID UNREASONABLY HIGH FEES</u>
<u>FOR IMPRUDENT SHARE CLASSES</u>

144. Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets.

145. There is no material difference between share classes other than costs – the funds hold identical investments and have the same portfolio manager.

146. Mutual fund companies routinely waive investment minimums for large retirement plans and did so with the Plan.

147. Mega defined contribution plans such as the PCA Plan have sufficient assets to qualify for the lowest cost share classes.

148. Unlike individual or retail investors, retirement plan fiduciaries often have access to several different share classes. A prudent plan fiduciary ensures that the plan selects the share class that provides the greatest benefit to plan participants given the institutional advantages provided to retirement plans in relation to retail investors.

149. During the Class Period, Defendants did not use share classes that provide the greatest benefit to plan participants in the form of lowest net expense ratio.

150. During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the share classes that provide the greatest benefit to plan participants in the form of lowest net expense ratio.

151. The following charts identify Defendants' share class investments during the Class Period vis-à-vis the prudent alternatives that provide the greatest benefit to Plan participants:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| DDFIX | Invesco Diversified Dividend R5 | 0.54% | 0.10% | 0.44% | LCEIX | Invesco Diversified Dividend Investor | 0.78% | 0.50% | 0.28% | 57% |
| MWTSX | Metropolitan West Total Return Bond Fund | 0.37% | 0.00% | 0.37% | MWTNX | Metropolitan West Total Return Bd Admin | 0.78% | 0.50% | 0.28% | 32% |
| MVSSX | Victory-Integrity Small Cap Value Fund R6 | 0.96% | 0.00% | 0.96% | VSVIX | Victory Integrity Small-Cap Value Y | 1.08% | 0.25% | 0.83% | 16% |
| | Average | 0.62% | 0.03% | 0.59% | | Average | 0.88% | 0.42% | 0.46% | 34.98% |

152. The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including, but not limited to, standard reports prepared by Alight.

153. Based upon data and information reflected in the charts above, the excessive fee paid by Participants during the Class Period as a result of Defendants' failure to use the prudent alternative share class that provided the greatest benefit to Plan Participants was approximately 33%.

154. There is no rational reason for a prudent plan fiduciary to choose an investment option that effectively charges a fee that is approximately 35% higher than an alternative investment option that provides the identical services of the same portfolio manager.

155. During the entirety of the Class Period, Defendants selected a share class that resulted in higher fees to Plan participants when a share class of the identical investment option was available that would have resulted in lower fees, to the substantial detriment of Plaintiffs and the Plan's participants.

156. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts

must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these share class allegations are not about reasonable tradeoffs between differently managed investments. The higher cost share classes selected by Defendants were identical to those lower-cost shares class identified in the chart above.

157. As an example, the Metropolitan West Total Return Bond Plan Fund (MWTSX), was selected by Plan fiduciaries and made available to participants in the Plan from 2016 through at least 2018.

158. As of December 31, 2018, Plan Participants had invested more than $58,141,272 in this investment option. The portfolio managers of this investment option were Stephen M. Kane, Laird R. Landmann and Bryan T. Whalen (Kane, Landmann & Whalen). Plan participants can receive the identical portfolio management services of Kane, Landmann & Whalen through several different investment options (share classes) with different fee structures. The fee structures for the varying share classes of this investment option, all managed by Kane, Landmann & Whalen, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Portfolio Management Services | | |
|---|---|---|
| | **Metropolitan West Total Return Bd Admin** | **Metropolitan West Total Return Bond Plan Fund** |
| **Share Class** | Admin | Plan |
| **Investment Advisor** | Metropolitan West | Metropolitan West |
| **Portfolio Managers** | Stephen M. Kane, Laird R Landmann & Bryan T. Whalen | Stephen M. Kane, Laird R Landmann & Bryan T. Whalen |
| **Ticker** | MWTNX | MWTSX |
| **Portfolio Management Fee** | 0.35% | 0.35% |
| **Total Expense Ratio** | 0.78% | 0.37% |
| **Revenue Sharing Credit** | 0.50% | 0.00% |
| **Net Investment Expense to Retirement Plans** | 0.28% | 0.37% |

159. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period including, but not limited to, standard reports prepared by Alight.

160. In the second to last row of the chart above, "Revenue Sharing Credit," is the portion of the "Total Expense Ratio" that is allocable to the provision of RKA.

161. As a result, the fee paid for the portfolio management services of the portfolio managers Kane, Landmann & Whalen to pursue the identical investment strategy with the same goals, objectives, and risk profile is the "Net Investment Expense to Retirement Plans" set forth in the bottom row.

162. The Metropolitan West Total Return Bd Admin (MWTNX) has the lowest net investment expense at 0.28%.

163. Despite the Total Expense Ratio being higher, the Metropolitan West Total Return Bd Admin (MWTNX) provides the greatest benefit to Plan participants because the 0.50% in revenue sharing that is allocable to RKA services is a credit that is returned to the participants directly or used as a credit against the RKA fee.

164. If the 0.50% allocable to RKA services exceeds the actual RKA fee, then the excess can also be returned to the Plan and its participants.

165. When two identical service options are readily available (in this case the portfolio management services of Kane, Landmann & Whalen) and would be known as part of the standard of care related to selecting and monitoring investment options, a prudent plan fiduciary ensures that the least expensive of those options is selected.

166. The industry standard is also clear when it comes to the lowest *net* expense ratio being the most prudent share class. CapTrust is "one of the largest providers of fiduciary services to retirement plan sponsors" and has "more than $660 billion in assets under advisement as of September 30, 2021" with at least $300 billion of that being assets in retirement plans. *See* CAPTRUST WEBPAGE, https://www.captrust.com/captrust-announces-addi-tion-of-new-jersey-based-portfolio-evaluations-inc/.

167. With regard to net expense ratios and share classes, CapTrust specifically identifies on its website a fiduciary "pitfall" is "benchmarking only the total expense ratio" and failing to consider the net expense, i.e., "expense ratio minus revenue sharing," pointing out that, "what should be compared to other investment managers of that same asset class or category is *expense ratio minus revenue sharing*." See CAPTRUST WEBPAGE, *Understanding and Evaluating Retirement Plan Fees/Part Two: Benchmarking Investment Fees*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-two-benchmarking-investment-fees/ (emphasis added.)

168. A hypothetical prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on a quarterly basis, would have identified the share class that provided the greatest benefit to Plan Participants, and would have transferred the Plan's investments into the prudent share classes at the earliest opportunity.

169. During the entirety of the Class Period, Defendants: 1) did not conduct an impartial and objectively reasonable review of the Plan's investments on a quarterly basis; 2) did not identify the prudent share classes available to the Plan; and 3) did not transfer the Plan's investments into this prudent share class at the earliest opportunity.

170. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable process when selecting its share classes, Defendants caused unreasonable and unnecessary losses to the Plan's Participants through 2020 in the amount of approximately $316,460 and as detailed in the following chart:

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| Net Investment Expense to Retirement Plans | $1,407,829 | $2,120,535 | $2,017,994 | $2,225,322 | $2,878,658 |

| Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|
| Net Investment Expense to Retirement Plans | $1,371,248 | $2,061,733 | $1,922,801 | $2,218,441 | $2,872,375 |

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Est. Investment Damages | $36,581 | $58,802 | $95,193 | $6,881 | $6,283 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% |
| Est. Cumulative Investment Damages | $36,581 | $103,365 | $194,000 | $261,952 | $316,460 |

171. During the entirety of the Class Period, and by failing to recognize that the Plan was invested in share classes that resulted in higher fees when share classes that resulted in lower fees to Plan participants was available for the same investment, and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of prudence to Plaintiff and the Plan participants.

## DEFENDANTS' INVESTMENTS IN THE PLAN

172. A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. (b)(1).

173. *Hughes v. Northwestern Univ.* holds that every investment on an ERISA plan's menu must be prudent, and "participants' ultimate choice over their investments [does not] excuse allegedly imprudent decisions by [fiduciaries]." 142 S. Ct. at 742.

174. For each of challenged imprudent investment, the plaintiff has provided a prudent alternative investment option that satisfied the same role as the challenged fund with respect to the plan fiduciaries' duty to provide a diversified lineup of investment options.

175. Each prudent alternative investment option is in the same Morningstar Investment category as the challenged option it should have replaced.

176. Each prudent investment option provided equivalent or superior risk adjusted returns compared to the challenged option at a lower net investment cost.

177. The prudent alternative investment options below (listed second) would have been superior to the challenged imprudent investment options (listed first) during the Class Period:

| Ticker | Fund Name | Morningstar Category | Morningstar Rating Overall | Morningstar Rating 3 Yr | Morningstar Rating 5 Yr | Morningstar Rating 10 Yr |
|--------|-----------|----------------------|----------------------------|--------------------------|--------------------------|---------------------------|
| DDFIX | Invesco Diversified Dividend R5 | US Fund Large Value | 3 | 2 | 2 | 3 |
| RMFGX | American Funds American Mutual R6 | US Fund Large Value | 5 | 4 | 5 | 5 |
| | | | | | | |
| RERGX | American Funds Europacific Growth R6 | US Fund Foreign Large Growth | 3 | 3 | 3 | 3 |
| VWILX | Vanguard International Growth Adm | US Fund Foreign Large Growth | 5 | 5 | 5 | 5 |
| | | | | | | |
| FBNRX | Templeton Global Bond R6 | US Fund Global Bond | 2 | 2 | 2 | 4 |
| DODLX | Dodge & Cox Global Bond I | US Fund Global Bond | 5 | 5 | 5 | - |
| | | | | | | |
| MVSSX | Victory Integrity Small-Cap Value R6 | US Fund Small Value | 2 | 2 | 2 | 3 |
| FRCSX | Franklin Small Cap Value R6 | US Fund Small Value | 4 | 4 | 4 | 4 |

178. During the Class Period, the chart below identifies a number of the same investment options that Defendants selected and/or made available to Plan Participants as compared to available prudent alternative and less expensive options.

| Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| DDFIX | Invesco Diversified Dividend R5 | 0.54% | 0.10% | 0.44% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 57% |
| - | Boston Partners Large Cap Value Fund Class D | 0.42% | 0.00% | 0.42% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 50% |
| RERGX | EuroPacific Growth Fund | 0.49% | 0.00% | 0.49% | VWILX | Vanguard International Growth Adm | 0.32% | 0.00% | 0.32% | 53% |
| LSVNX | Loomis Sayles Value Fund | 0.57% | 0.00% | 0.57% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 104% |
| FBNRX | Templeton Global Bond Fund R6 | 0.57% | 0.00% | 0.57% | DODLX | Dodge & Cox Global Bond | 0.45% | 0.08% | 0.37% | 54% |
| MVSSX | Victory-Integrity Small Cap Value Fund R6 | 0.96% | 0.00% | 0.96% | FRCSX | Franklin Small Cap Value R6 | 0.63% | 0.00% | 0.63% | 52% |
| | *Average* | *0.59%* | *0.02%* | *0.58%* | | *Average* | *0.37%* | *0.01%* | *0.36%* | *61.71%* |

179. During the Class Period and based on the charts above, the average net investment expense of the investments selected and made available to Plan participants by the Plan fiduciaries identified above was 0.58%, or 58 basis points.

180. During the Class Period and based on the charts above, the investment options selected by the Plan fiduciaries were 61.71% more expensive than prudent alternative and less expensive options covering the same asset category.

181. During the Class Period, Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

182. During the Class Period and had Defendants been acting in the best interests of the Plan's participants, Defendants would have selected funds with lower expense ratios than those funds actually selected by Defendants, such as the ones identified in the chart above.

183. During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

184. During the Class Period, Plaintiffs had no knowledge of how the fees charged to and paid by the Plan participants compared to any other funds.

185. During the Class Period, Plaintiffs did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants failed to reasonably offer because Defendants provided no comparative information to allow Plaintiffs to evaluate and compare Defendants' investment options.

186. During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with Alight, thereby paying fees that were more than necessary to the detriment of Plaintiffs and the Plan's participants.

187. During the Class Period and because Defendants imprudently chose investment options that were not similar or identical to the lower cost comparator funds identified above, Defendants caused unreasonable and unnecessary losses to Plaintiffs and Plan's participants.

188. During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2015 to 2020 were more expensive by significant multiples of comparable actively managed, alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

189. During the Class Period and because Defendants failed to act in the best interests of the Plan's participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of higher-cost funds, Plaintiff and the Plan's participants incurred objectively unreasonable actual expenses and costs.

190. During the Class Period and because Defendants failed to act prudently by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiff and the Plan's participants in the amount of approximately $935,452 through 2020 and as detailed in the following chart:

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| Net Investment Expense to Retirement Plans | $1,407,829 | $2,120,535 | $2,017,994 | $2,225,322 | $2,878,658 |

| Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|
| Net Investment Expense to Retirement Plans | $1,294,476 | $1,953,661 | $1,903,599 | $2,087,052 | $2,738,868 |

| | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|
| Est. Investment Damages | $113,353 | $166,874 | $114,394 | $138,270 | $139,791 |
| Compounding Percentage (VIIIX) | | 21.82% | -4.41% | 31.48% | 18.41% |
| Est. Cumulative Investment Damages | $113,353 | $304,960 | $405,906 | $671,954 | $935,452 |

191. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's participant fee disclosures.

192. During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments, Defendants breached their fiduciary duties of prudence to Plaintiff and Plan participants.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR MANAGED ACCOUNT SERVICE FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE MANAGED ACCOUNT SERVICE FEES

193. Defendants retained Alight's wholly-owned subsidiary, Alight Financial Advisors ("AFA") to provide its own Professional Management Program ("PMP") to provide managed account services to the Plan.

194. For this service, up through at least the end of 2020, Defendants have allowed Plan participants to pay an annual fee of at least 0.60% on the first $100,000, 0.45% on the next $150,000, and 0.30% on assets greater than $250,000.

195. Companies are not required to publicly disclose the fee rates for managed account services making it difficult to obtain marketplace data. That said, the table below illustrates the fee rates paid by similarly situated plans for materially identical managed account services.

| Managed Account service fee rates of similarly situated plans | Fee on 1st Tier | Fee on 2d Tier | Fee on 3d Tier |
|---|---|---|---|
| PCA "Professional Management Program" | 0.60% | 0.45% | 0.30% |
| AGFA Healthcare Corp. Employee Savings Plan (2018) | 0.40% | 0.30% | 0.20% |
| Caterpillar Sponsored 401(k) Plans (2016) | 0.40% | 0.30% | 0.20% |
| Citi Ret. Savings Plan (2015) | 0.35% | 0.30% | 0.25% |
| JC Penney 401(k) Savings Plan (2015) | 0.35% | 0.25% | 0.10% |
| Comcast Corp. Ret. Investment Plan (2019) | 0.00% | 0.30% | 0.20% |

196. As illustrated above, in all cases, the participants in the other comparator plans are paying fee rates at every tier lesser than Plan participants.

197. A number of other managed account providers exist whose services are virtually identical to the services provided to Plan participants through the "Professional Management" service and whose fees range from 0.25% to 0.30% on all assets, e.g., Betterment, Vanguard, and Charles Schwab, for plans much smaller than the PCA Plan.

198. The fee rates paid by the Plan participants for the PMP was excessive and objectively unreasonable given the Plan's size and negotiating power.

199. The services provided by managed account service providers are materially identical at the mega plan level. All these managed account services offer "[t]o help . . . create an investment strategy, . . . and to provide fiduciary investment services to plan participants."

200. AFA also offers, like all other managed account service providers at this level, through its PMP, "[a]n Online Advice tool can help [participants] fine-tune [their] investing strategy, and the Professional Management program offers personalized portfolio management from professional investment advisors."

201. Defendants could have offered the exact same managed account services at a lower cost by using a different managed account provider but did not do so.

202. Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, these managed account allegations are not about reasonable tradeoffs between managed account service providers offering a different level or quality of services.

203. Rather, Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing managed account service provider, and Defendants could have obtained the materially same managed account services for less through another provider if it had solicited competitive bids for the same services.

204. The Plan's PMP managed account service also added no material value to participants to warrant the additional fees.

205. The asset allocation created by the PMP was not materially different than the asset allocation of the age appropriate target date option made available to the Plan's participants at a much lower fee.

206. As the GAO recognized in its reports on managed accounts, "Similar advantages … can be achieved through other retirement investment vehicles outside of a managed account and without paying the additional managed account fee. For example, in one recent study, a record keeper that offers managed accounts through its platform showed that there are other ways to diversify using professionally managed allocations, such as target date funds, which can be less costly." THE UNITED STATES GOVERNMENT ACCOUNTABILITY OFFICE ("GAO"), *401(K) PLANS: Improvements Can Be Made to Better Protect Participants in Managed Accounts*, at 32 (June 2014), available at https://www.gao.gov/assets/670/664391.pdf.

207. As a result, based on the value provided, the reasonable fee for Plan's PMP was zero or very close to zero.

208. Defendants did not prudently evaluate the incremental value provided by the Plan's PMP managed account service to determine that the fees were warranted.

209. A prudent fiduciary would have conducted periodic competitive solicitations (including issuing an RFP, if necessary), as well as evaluating the incremental value provided to Plan participants, to ensure that the amounts paid by the Plan for

managed account services were reasonable.

210. Based on the excessive amounts paid by the Plan for managed account services, it is reasonable to infer that Defendants failed to prudently monitor and manage the Plan's managed account services.

211. Defendants' failure to properly monitor or control fees for the Plan's managed account service fees resulted in Plan participants paying excessive and objectively unreasonable fees, which cost the Plaintiff and other Class members millions of dollar in harm to their retirement accounts.

## CLASS ACTION ALLEGATIONS

212. 29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

213. In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Packaging Corporation of America Retirement Savings Plan for Salaried Employees (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning March 23, 2016 and running through the date of judgment.

214. The Class includes over 5,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

215. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties

to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

   a.   Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

   b.   Whether Defendants breached their fiduciary duties to the Plan;

   c.   What are the losses to the Plan resulting from each breach of fiduciary duty; and

   d.   What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

216.   Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

217.   Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

218.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for

Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

219. Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

220. Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

221. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

222. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

223. Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

224. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

<u>FIRST CLAIM FOR RELIEF</u>
Breach of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Committee Defendants –
<u>Recordkeeping Fees)</u>

225. Plaintiff restates the above allegations as if fully set forth herein.

226. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

227. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

228. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable recordkeeping fees.

229. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's recordkeeping fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

230. During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's recordkeeping fees were objectively reasonable, defray reasonable expenses of

administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

231. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

232. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

233. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

234. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

235. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

236. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the PCA Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
Breaches of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Committee Defendants –
Investment Management Fees)

237. Plaintiff restates the above allegations as if fully set forth herein.

238. Committee Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

239. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Committee Defendants in managing the investments, including share classes, of the Plan.

240. Committee Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

241. During the Class Period, Committee Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

242. During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan prudently, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

243. Committee Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long those investments had been in the Plan.

244. During the Class Period, Committee Defendants breached their fiduciary duties of prudence to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

245. Committee Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion, prudently evaluating and monitoring the Plan's investments on an ongoing basis, eliminating funds or share classes that did not serve the best interest of Plan participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

246. Committee Defendants failed to employ a prudent process by failing to evaluate the cost of the Plan's investments and fees critically or objectively in comparison to other more reasonable investment options.

247. Committee Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times in same asset category and in the same investment style.

248. Committee Defendants failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

249. As a result of Committee Defendants' breach of their fiduciary duties of prudence with respect to the Plan, the Plaintiff and Plan participants suffered unreasonable and unnecessary monetary losses.

250. Committee Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Committee Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
**Breaches of Duty of Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Committee Defendants –**
**Managed Account Service Fees)**

251. Plaintiff restates the above allegations as if fully set forth herein.

252. Defendant Committee is a fiduciary of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

253. 29 U.S.C. §1104(a)(1)(B) imposes fiduciary duties of prudence upon Defendant Committee in their administration of the Plan.

254. Defendant Committee, as fiduciary of the Plan, is responsible for selecting a managed account service provider that charges reasonable managed account service fees.

255. During the Class Period, Defendant Committee had a fiduciary duty to do all of the following: ensure that the Plan's managed account service fees were reasonable; manage the assets of the Plan prudently; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

256. During the Class Period, among other things, Defendant Committee imprudently caused the Plan to pay excessive managed account service fees and failed to properly monitor and control those expenses.

257. During the Class Period, Defendant Committee had a continuing duty to regularly monitor and evaluate the Plan's managed account provider to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding managed account services and the significant bargaining power the Plan had to negotiate the best fees.

258. During the Class Period, Defendant Committee breached its duty to Plan participants, including Plaintiff, by failing to employ a prudent process to evaluate the cost of the Plan's managed account provider critically or objectively in comparison to other managed account options that were readily available.

259. Defendant Committee's failure to discharge its duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. §1104(a)(1)(B).

260. As a result of Defendant Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff, and Plan participants suffered objectively unreasonable and unnecessary monetary losses.

261. Defendant Committee is liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

<u>FOURTH CLAIM FOR RELIEF</u>
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Defendants PCA and Board –
<u>Recordkeeping Fees</u>)**

262. Plaintiff restates the above allegations as if fully set forth herein.

263. Defendants PCA and Board had the authority to appoint and remove members or individuals responsible for Plan recordkeeping fees on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

264. In light of this authority, Defendants PCA and Board had a duty to monitor those individuals responsible for Plan recordkeeping fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

265. Defendants PCA and Board had a duty to ensure that the individuals responsible for Plan administration on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

266. The objectively unreasonable and excessive recordkeeping fees paid by the Plan inferentially suggest that Defendants PCA and Board breached their duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees on the Committee or have a system in place for doing

so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably recordkeeping expenses;

b.     Failing to monitor the process by which the Plan's recordkeeper, Alight, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.     Failing to remove individuals responsible for Plan recordkeeping fees on the Committee whose performance was inadequate in that these individuals continued to pay the same recordkeeping costs even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

267.    As the consequences of the foregoing breaches of the duty to monitor for recordkeeping fees the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

268.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants PCA and Board are liable to restore to the PCA Plan all loses caused by their failure to adequately monitor individuals responsible for Plan recordkeeping fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FIFTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendants PCA and Board**
**– Investment Management Fees)**

269.    Plaintiff restates the above allegations as if fully set forth herein.

270. Defendants PCA and Board had the authority to appoint and remove members or individuals responsible for Plan investment management fees on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

271. In light of this authority, Defendants PCA and Board had a duty to monitor those individuals responsible for Plan investment management fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

272. Defendants PCA and Board had a duty to ensure that the individuals responsible for Plan administration on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

273. The objectively unreasonable and excessive investment management fees paid by the Plan inferentially suggest that Defendants PCA and Board breached their duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan investment management fees on the Committee or have a system in place

for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably investment management expenses;

b.      Failing to monitor the process by which the Plan's recordkeeper, Alight, was evaluated and failing to investigate the availability of more reasonably-priced investment management fees; and

c.      Failing to remove individuals responsible for Plan investment management fees on the Committee whose performance was inadequate in that these individuals continued to pay the same investment management costs even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

274.    As the consequences of the foregoing breaches of the duty to monitor for investment management fees, the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

275.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants PCA and Board are liable to restore to the PCA Plan all loses caused by their failure to adequately monitor individuals responsible for Plan investment management fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**SIXTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendant PCA and Board**
**– Managed Account Fees)**

276.    Plaintiff restates the above allegations as if fully set forth herein.

277. Defendants PCA and Board had the authority to appoint and remove members or individuals responsible for Plan managed account fees on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

278. In light of this authority, Defendants PCA and Board had a duty to monitor those individuals responsible for Plan managed account fees on the Committee to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

279. Defendants PCA and Board had a duty to ensure that the individuals responsible for Plan administration on the Committee possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

280. The objectively unreasonable and excessive managed account fees paid by the Plan inferentially suggest that Defendants PCA and Board breached their duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of individuals responsible for Plan managed account fees on the Committee or have a system in place for

doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably managed account expenses;

b. Failing to monitor the process by which the Plan's managed account service provider, AFA, was evaluated and failing to investigate the availability of more reasonably-priced managed account providers; and

c. Failing to remove individuals responsible for Plan managed account fees on the Committee whose performance was inadequate in that these individuals continued to pay the same managed account costs even though solicitation of competitive bids would have shown that maintaining AFA as the managed account provider at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan participants' retirement savings.

281. As the consequences of the foregoing breaches of the duty to monitor for managed account fees, the Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

282. Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants PCA and Board are liable to restore to the PCA Plan all loses caused by their failure to adequately monitor individuals responsible for Plan managed account fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.   Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.   A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.   An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable recordkeeping, managed account, and investment management costs, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.   An Order requiring Defendant PCA to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against PCA as necessary to effectuate relief, and to prevent PCA's unjust enrichment;

F.   An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.   Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.   An award of pre-judgment interest;

I.   An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.   Such other and further relief as the Court deems equitable and just.

Dated this 17th day of June, 2022

*s/ Paul M. Secunda* _____

Paul M. Secunda
**WALCHESKE & LUZI, LLC**
235 Executive Dr., Suite 240
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
E-Mail: psecunda@walcheskeluzi.com

Troy W. Haney
**HANEY LAW FIRM, P.C.**
330 E. Fulton
Grand Rapids, MI 49503
Telephone: (616) 235-2300
Fax: (616) 459-0137
E-Mail: thaney@troyhaneylaw.com

**Attorneys for Plaintiff**