UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HARVEY MILLER,

       Plaintiff,

                                      Case No. 1:22-cv-271

v.

                                        Hon. Hala Y. Jarbou

PACKAGING CORPORATION OF
AMERICA, INC., et al.,

       Defendants.
_____/

## <u>OPINION</u>

Plaintiff Harvey Miller brings this putative class action under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., against his former employer, Defendant Packaging Corporation of America, Inc. ("PCA").  Miller also sues PCA's Board of Directors and its members, Mark W. Kowlzan, Cheryl K. Beebe, Duane Farrington, Donna A. Harman, Robert C. Lyons, Thomas P. Maurer, Samuel M. Mencoff, Roger B. Porter, Thomas A. Souleles, and Paul T. Stecko (collectively, the "Board Defendants").  In  addition, Miller sues PCA's Investment Committee and its members, Michelle Wojdyla, Robert P. Mundy, and Pamela A. Barnes (collectively, the "Committee Defendants").  Before the Court is Defendants' motion to dismiss the amended complaint (ECF No. 28).  For the reasons herein, the Court will grant the motion in part and deny it in part.

# I. BACKGROUND

## A. The Plan

According to the amended complaint, Miller was employed by PCA from August 1995 to August 2014.  Until August 17, 2016, he was a participant in PCA's defined contribution pension benefit plan (the "Plan").

> Defined-contribution plans allow employees to save for retirement, often through a tax-advantaged account like a 401(k) plan, sometimes with matching contributions from their employers.  Employees choose how to invest their accounts from a menu of investment options offered by the plans.  The initial contributions and any growth or decline over time (minus fees charged) determine the eventual post-retirement payouts from these accounts—along with any interest and dividends generated by the investments.

*Forman v. TriHealth, Inc.*, 40 F.4th 443, 446 (6th Cir. 2022) (citations omitted).

PCA has approximately 15,000 employees.  (Am. Compl. ¶ 28, ECF No. 14.)  In 2019, the Plan had more than 5,000 participants and managed assets worth more than $1.1 billion dollars.  (*Id.* ¶ 35.)  According to Miller, this means it had more assets than 99.86% of the defined contribution plans in the United States.  (*Id.*)  Thus, Miller refers to the Plan as a "mega 401(k) Plan," which he defines as a plan with more than $500 million dollars in assets.  (*Id.* ¶ 27.)  Such plans generally have more bargaining power than smaller plans.  (*Id.* ¶ 34.)

## B. Defendants

All Defendants are allegedly fiduciaries of the Plan, but the Committee Defendants manage the "day-to-day administration and operation of the Plan[.]"  (*Id.* ¶ 31.)  They act as the "Plan Administrator."  (*Id.*)

ERISA requires the fiduciaries of an employer sponsored pension benefit plan to discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct

of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).  ERISA permits

a plan participant to bring a claim for breach of that duty.  *See* 29 U.S.C. § 1132(a)(2).

### C. Claims

Miller intends to bring this case as a class action on behalf of himself and others who have

been participants or beneficiaries of the Plan from March 23, 2016, to the date of judgment in this

case.  (Am. Compl. ¶ 213.)  He claims that Defendants breached their fiduciary duties in several

ways.

### 1. Recordkeeping & Administrative Fees (Count 1)

First, Committee Defendants allegedly failed to ensure that the recordkeeping and

administrative fees charged by the Plan's recordkeeper, Alight Financial Solutions, LLC, were

"objectively reasonable."  (Am. Compl. ¶¶ 6, 230.)

### 2. Imprudent Investment Options (Count 2)

Second, Committee Defendants allegedly failed to ensure that the investment options

offered by the Plan were "prudent" options.  (*Id.* ¶ 243.)  Some of the options offered allegedly

charged managed investment fees that were excessive in comparison to comparable funds

available on the market.  (*Id.* ¶¶ 177-79.)

> Defined-contribution plans generally give employees a range of investment
> options.  Some may involve actively managed funds, in which the professionals try
> to maximize returns in a variety of ways.  Among them: buying and selling shares
> in companies based on predictions about future performance; identifying
> companies with long-term value; and hedging risk by determining the right balance
> of equities, bonds, and cash in the portfolio.  At any given time, there can be bullish
> actively managed funds and bearish actively managed funds.  In recent decades,
> another option has become prevalent for employee investors: passively managed
> funds. These funds simply track the stocks in, say, the S&P 500 or some other stock
> or bond index.

*TriHealth*, 40 F.4th at 446.

Also, for three of the funds offered, there were alternatives available in a different share class that purportedly charged lower investment fees.  (*Id.* ¶ 151.)

> Retirement plans often allow individual employees to access investment options available only to large institutional investors.  Mutual fund providers frequently offer different classes of shares.  The classes have distinct minimum investment amounts and a range of expenses, the latter often based on a percentage fee of, say 0.50% or 50 basis points, that each fund charges for managing the investment. "Retail" share classes are readily accessible to individual investors.  "Institutional" share classes, by contrast, often have a high minimum-balance requirement of $100,000 or more.  For those eligible for institutional shares, the providers will waive commissions for selling shares and charge a lower expense ratio.  All share classes of a fund typically employ the same investment strategy, portfolio, and management team.

> Institutional share classes typically cost less.  Wholesale discounts permit the funds to charge a lower expense ratio when the total investment—say tens of millions of dollars—will be greater.  Large institutional investors also cover many of the administrative expenses that the mutual fund would have to pay for retail shares aimed at individual investors, such as marketing and recordkeeping fees.  The institutional share class as a result invariably offers the lowest expenses in the mutual fund universe.

*TriHealth*, 40 F.4th at 446-47 (citations and quotations marks omitted).

### 3. Managed Account Services Fees (Count 3)

Third, Miller alleges that Committee Defendants made available to Plan participants "managed account services" under an annual fee that was excessive in comparison to fees charged by other providers.  (*Id.* ¶¶ 87-89, 195.)

### 4. Failure to Monitor (Counts 4 to 6)

Although the complaint contains six separate counts, the first three counts are based on essentially the same facts as the last three counts.  The difference between the former and the latter is that the first three counts are asserted against the Committee Defendants, whereas the last three counts are asserted against PCA and the Board Defendants.  In the last three counts, Miller claims that PCA and the Board Defendants failed to monitor the Committee Defendants with regard to their decisions about RKA fees, investment options, and managed account services fees.

Defendants argue that Miller lacks standing to bring his claims and/or that his allegations fail to state a viable claim.

## II. DISMISSAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court may dismiss a complaint for failure to state a claim.  The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  While "[t]he plausibility standard . . . is not akin to a probability requirement . . . it asks for more than a sheer possibility" that the alleged misconduct occurred.  *Id*.  "The plausibility of an inference depends on a host of considerations, including common sense and the strength of competing explanations for the defendant's conduct." *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013).  "[A] statement of facts that merely creates a suspicion of a legally cognizable right of action is insufficient." *Bishop v. Lucent Techs., Inc.*, 520 F.3d 516, 520 (6th Cir. 2008).

 "Whether a party has [Article III] standing is an issue of the court's subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)." *Lyshe v. Levy*, 854 F.3d 855, 857 (6th Cir. 2017).  "A plaintiff must have standing for each claim pursued in federal court." *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015).

When considering a motion to dismiss under Rule 12(b)(1) or Rule 12(b)(6), courts "construe the complaint in the light most favorable to the plaintiff, accepting all well-pleaded factual allegations as true." *Parrino v. Price*, 869 F.3d 392, 397 (6th Cir. 2017).  The Court need not accept "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678, or "formulaic recitations of the elements of a cause of action," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Courts are generally bound to consider only the complaint when resolving a motion to dismiss unless the Court converts the motion to one for summary judgment.  However, the Court may also consider "exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein."  *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

### III. ANALYSIS

### A. Recordkeeping & Administrative Fees (Count 1)

Retirement plans require administrative services, which are often provided by a third party known as the recordkeeper.  These services may include the following:  maintaining records; processing the purchase and sale of participant assets; communicating with plan participants; providing updates to plan documents; providing consulting services to plan participants; accounting and audit services, including the preparation of annual reports; and ensuring that the operation of the plan follows legal requirements and the requirements of the plan itself.  (Am. Comp. ¶ 43.)  Miller alleges that the foregoing are "standard services" typically provided to mega plans on an "all-you-can-eat" basis as part of a "bundled" fee. (*Id.*)  Thus, recordkeepers generally quote these fees on a "per participant basis without regard for any individual differences in services requested[.]"  (*Id.* ¶ 44.)  Miller refers to these services as "Bundled RKA" services.  (*Id.* ¶ 43.)

According to the complaint, recordkeepers provide other services on an "ad hoc" basis. (*Id.* ¶ 44.)  The recordkeeper's fee for these other services varies depending on their usage by the individual participants of a plan.  Such services typically include loan processing, account maintenance, asset distribution services, and processing of "Qualified Domestic Relations Orders."  (*Id.*)  Miller refers to the foregoing services as "Ad Hoc RKA" services.  (*Id.*)

Miller alleges that the "vast majority of fees earned by recordkeepers typically come from the fee for providing Bundled RKA services as opposed to the Ad Hoc RKA services." (*Id.* ¶ 47.) And because many recordkeepers "can provide the complete suite of required RKA services," plan fiduciaries can make "apples-to-apples comparisons" between them. (*Id.* ¶ 48.) Miller contends that plan fiduciaries "use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fees" charged by different recordkeepers. (*Id.* ¶ 49.)

Miller alleges that the Plan charged each participant an annual "administrative fee" of $80 for a "standard level of Bundled RKA services . . . of a nearly identical level and quality to other record keepers who also serviced mega plans during the [relevant period]." (*Id.* ¶ 51.) The Plan's fee disclosure statement states that the administrative fee covers "trustee, legal, recordkeeping, and accounting services." (*Id.* ¶ 53; *see* Annual Fee Disclosure Statement (2016), ECF No. 11-3, PageID.198.)[1] Miller alleges that the Plan then paid Alight this fee in each of the years 2016 through 2020. (*Id.* ¶ 110.) Miller himself paid $40 for the first half of 2016. (*Id.* ¶ 125.) Miller identifies nine other plans who allegedly paid their respective recordkeepers lower annual administrative fees per participant in 2018; those fees ranged from $20 to $48, with an average of $38, as indicated in the following chart ("Table 1"):

---

[1] The Court can consider the fee disclosure statement because it is mentioned in the complaint and is central to Miller's claim.

7

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|---|
| Owensboro Health 403(B) Safe Harbor Plan | 2,692 | $56,333,636 | $127,951 | $48 | Prudential |
| The Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund | 4,369 | $421,208,989 | $185,805 | $43 | Vanguard |
| Under Armour 401(K) Plan | 4,485 | $179,198,512 | $89,400 | $20 | T. Rowe Price |
| **PCA Plan Average Fee** | **5,017** | **$1,003,594,604** | **$401,344** | **$80** | **Alight** |
| Healthfirst Profit Sharing 401(K) Plan | 4,950 | $227,721,800 | $201,889 | $41 | Vanguard |
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price |
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price |

(*Id.* ¶ 111.)  The figures in this chart are based on "2018 Form 5500 information."  (*Id.* ¶ 111 n.1.)

## 1. Standing

Defendants argue that Miller does not have standing to raise this claim because he has only alleged an injury in 2016 based on data from 2018.  The following elements are necessary to establish standing under Article III:

> First, Plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted).  "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege

facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Here, Miller has alleged that he suffered injury by paying an excessive administrative fee in 2016. That injury is sufficiently concrete to give Miller standing to assert his claim. Defendants suggest that there is a "de minimis" exception to Article III standing where the injury is small, but the case they rely upon is inapposite. In *Johnston v. Midland Credit Management*, 229 F. Supp. 3d 625 (W.D. Mich. 2017), the court concluded that the plaintiff did not suffer a concrete injury when he received a letter that mistakenly offered to settle a debt that he owed. *Id.* at 628-30. There, the plaintiff asserted a claim based on the mere receipt of a misleading letter; he could not identify any concrete injury arising from his circumstances. In contrast, Miller alleges that he paid more than he should have due to Defendants' breach of their fiduciary duties. That allegation of concrete financial injury gives Miller standing to assert his claim.

Defendants also suggest that Miller's reliance on data from 2018 deprives him of standing because Miller was not a participant of the Plan in 2018. However, the Court construes the complaint as asserting, at a minimum, that the data from 2018 suggests that the fee charged to Miller in 2016 was excessive. Defendants may dispute the relevance of data from 2018, but that argument goes to the merits of Miller's claim. It does not impact the standing analysis. The Court must "keep the merits of [a] claim separate from the standing question." *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855, 865 n.3 (6th Cir. 2020).

Defendants also rely on *O'Driscoll v. Plexus Corp.*, No. 20-C-1065, 2022 WL 3600824 (E.D. Wis. Aug. 23, 2022), but that case is distinguishable. There, the plaintiff participated in her employer's plan for approximately eight months. *Id.* at *2. Like Miller does here, she claimed that the plan's fiduciaries caused the plan to pay excessive recordkeeping fees. During the

plaintiff's brief period of participation in the plan, the recordkeeper charged, at most, a single annual recordkeeping and administrative fee of $38.  *Id.* at *4.  However, the plaintiff could not show that she suffered a loss because the fee charged "was $10 *less* than what [plaintiff] suggests is a reasonable . . . fee[.]" *Id.* (emphasis added).  Because she could not demonstrate an injury, she lacked standing to pursue her claim.  *Id.*

In contrast, Miller alleges that he was charged $40 for RKA services over the course of six months, which is more than what other plans allegedly paid per participant over the course of a year.  These facts are sufficient to allege an injury for purposes of standing.[2]

### 2. Merits

Defendants argue that, even if Miller has standing to pursue his claim regarding RKA fees, his allegations fail to state a viable claim under ERISA.  To state such a claim, Miller must allege that the fees were "high in relation to the services provided." *TriHealth*, 40 F.4th at 449.   But Miller does not identify the services provided by the other recordkeepers to compare them to the services provided by Alight.  It is common sense that a recordkeeper who provides more services per participant will generally charge a higher fee.

Miller attempts to make his comparison more meaningful by alleging that the recordkeepers identified in Table 1 above provided "a similar level and quality of services[.]" (Am. Compl. ¶ 111.)  He also alleges that recordkeepers servicing mega plans all offer the same bundle of essential services, and that any "minor variations in the level and quality" of these services "has little to no material impact on the fees charged by recordkeepers."  (*Id.* ¶ 45.)  But both of these allegations are conclusory.  Miller provides no facts to support his contention that

---

[2] Although Miller is no longer a participant in the Plan, he has standing to pursue claims where a breach of fiduciary duty diminished the value of his retirement account, such that "it would have been worth more th[a]n had it not been for the breach of fiduciary duty." *Harzewski v. Guidant Corp.*, 489 F.3d 799, 807 (7th Cir. 2007); *accord Bridges v. Am. Elec. Power Co.*, 498 F.3d 442, 445 (6th Cir. 2007).

the RKA services provided to mega plans are generally the same, or that the recordkeepers in his chart provided essentially the same services as Alight.

Indeed, contrary to Miller's assertions about uniformity among recordkeepers servicing large plans, the forms on which he relies suggest that the recordkeepers in his chart provided different types of services for their respective clients.[3]  The Form 5500 filed by each of the plans in Table 1 above list "service codes" corresponding to the services provided by the recordkeepers. (*See* Table 2 of Defs.' Br., ECF No. 29, PageID.593 (identifying the service codes found on the forms).)  Those codes vary from plan to plan, with some plans listing more codes than others, suggesting that the particular services provided by the recordkeepers were not all the same; rather, they varied by type and/or quantity.

Because of the variation in services provided by the different recordkeepers, it is difficult to make a fair comparison between Alight's RKA fee and the fee charged by the recordkeepers in his chart.  Miller alleges that Alight's administrative fee covered only "trustee, legal, recordkeeping, and accounting services." (Am. Compl. ¶ 53.)  However, he does not allege facts from which to make a plausible inference that the RKA fee charged by the other recordkeepers covered those same services.

In addition, Defendants note that Miller's fee calculations are not supported by the forms on which he relies.  In some cases, Miller apparently assumes that the "direct compensation" to the recordkeeper disclosed on the Form 5500 corresponds to the total compensation received by the recordkeeper. (*See, e.g.*, Form 5500 for Boston Consulting Group, Inc. Employees' Profit Sharing Retirement Fund, ECF No. 11-10, PageID.326 (disclosing $185,505 as the direct

---

[3] The Court can take judicial notice of these forms without converting the motion to one for summary judgment because the forms are public records that are mentioned in the complaint and are central to Miller's claims.  In addition, the Court can consider Defendants' summaries of the information in those forms, as those summaries are argument, not evidence.  The summaries simply compile data from the forms themselves.

compensation, which is the same as the RKA fee listed on Miller's chart).)  But all the plans in Miller's chart disclosed that their recordkeepers also received "indirect compensation."  (*See id.*)  Yet none of the forms indicate the amount of that indirect compensation, so it is impossible to discern the total compensation that the recordkeepers received for their services.[4]

In other cases, the RKA fee in Miller's chart does not clearly correspond to any figures in the Form 5500.  For instance, the Form 5500 for the Under Armour 401(k) Plan discloses direct compensation of $30,806 to its recordkeeper, T. Rowe Price RPS Inc. (*see* ECF No. 11-10, PageID.369), but Miller contends that the RKA fee for that plan was $89,400.  In other words, Miller's fee calculations appear to be conclusory.  He fails to allege a factual basis for inferring that the RKA fees in his chart reflect the total charge for the RKA services provided to those plans.

Some courts faced with similar allegations have concluded that they were not sufficient to state a claim under ERISA.  *See, e.g.*, *Sigetich v. Kroger Co.*, No. 1:21-cv-697, 2023 WL 2431667, at *10 (S.D. Ohio Mar. 9, 2023); *Mator v. Wesco Distrib., Inc.*, No. 2:21-CV-00403-MJH, 2022 WL 3566108, at *10 (W.D. Pa. Aug. 18, 2022) (citing cases).  In *Mator*, for instance, the plaintiffs provided a chart like the one here, using information disclosed in Form 5500s to calculate the RKA fee per participant for other retirement plans.  *See id.* at *7.  And as here, the plaintiffs in *Mator* alleged that the RKA services provided to other large plans were essentially identical in type and quality as the services provided to the plaintiffs' plan.  *Id.* at *5.  But the court concluded that the plaintiffs had "presented nothing beyond conclusory allegations regarding services with no particularity as to the quality of the services that the [plaintiffs] received."  *Mator*, 2022 WL 3566108, at *7.

---

[4] Miller acknowledges in his complaint that recordkeepers "often" collect a portion of their fees through "revenue sharing" or "indirect compensation" (Am. Compl. ¶ 60), but the Court cannot discern how he accounts for indirect compensation when reporting the RKA fees of comparators.

As to the comparison chart in *Mator*, the court noted that the "so-called comparators" varied greatly in terms of the number of participants and the amount of assets held, raising "serious doubt as to the plausibility of how the purported comparator plans are indeed comparable."  *Id.* at *8; *see also Sigetich*, 2023 WL 2431667, at *10 (noting that "differences in size call into question Plaintiff's comparable plans and whether the Kroger Plan's recordkeeping fees were excessive relative the services rendered").  The same is true for Miller's list of comparators.

The court in *Mator* also noted that the plaintiffs' fee calculations did not account for indirect compensation to the recordkeeper.  *Id.*  Miller's calculations suffer from the same flaw, casting doubt on their plausibility.  In short, "without pleading additional details as to fee structures and services provided," Miller's complaint "only infers a possibility but not a plausibility that Defendants acted imprudently."  *See id.*; *accord Probst v. Eli Lilly & Co.*, No. 1:22-cv-01106-JMS-MKK, 2023 WL 1782611, at *10 (S.D. Ind. Feb. 3, 2023) (rejecting as "wholly conclusory" allegations that "all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services").

Miller relies on several unpublished decisions in which courts accepted allegations like those in his complaint.  *See, e.g.*, *Lucero v. Credit Union Ret. Plan Assoc.*, No. 22-cv-208-jdp, 2023 WL 2424787 (W.D. Wis. Mar. 9, 2023); *Brown v. MITRE Corp.*, No. 22-CV-10976-DJC, 2023 WL 2383772 (D. Mass. Mar. 6, 2023); *Ruilova v. Yale-New Haven Hosp., Inc.*, No. 3:22-CV-00111-MPS, 2023 WL 2301962 (D. Conn. Mar. 1, 2023); *Laabs v. Faith Techs., Inc.*, No. 20-C-1534, 2022 WL 3594054 (E.D. Wis. Aug. 23, 2022).  Those opinions are not persuasive.  The courts in *Brown*, *Ruilova*, and *Laabs* did not consider the flaws in the assumptions that Miller has made here, or the apparent variation in services provided by the allegedly comparable recordkeepers.  Indeed, the court in *Laabs* reconsidered its decision and then dismissed the

13

complaint for failure to state a claim.  *See Laabs v. Faith Techs., Inc.*, No. 20-C-1534, 2022 WL 17417583, at *1 (E.D. Wis. Dec. 5, 2022).

Although the court in *Lucero* did consider similar shortcomings in the plaintiffs' allegations, that case is distinguishable because the recordkeeping fee in that case was "approximately 10 times higher than the fees of plans with a similar number of participants." *Lucero*, 2023 WL 2424787, at *3.  That disparity was significant enough to infer imprudence.  *Id.* at *3-5.  No such disparity is alleged here.

Miller also relies on his allegations that "the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for . . . recordkeeping services is to obtain competitive bids," and that Defendants failed to regularly solicit "quotes and/or competitive bids from recordkeepers" in order to find a reasonable rate.  (Am. Compl. ¶¶ 105, 108 (emphasis in original).)  These allegations are also conclusory.  Miller provides no facts to support his assertion that a competitive bidding process is the "only" way to determine a reasonable price for RKA services.  "ERISA does not require plan fiduciaries to obtain competitive bids from plan service providers."  *Ferguson v. Ruane Cunniff & Goldfarb Inc.*, No. 17-CV-6685 (ALC), 2019 WL 4466714, at *8 (S.D.N.Y. Sept. 18, 2019).  There are many ways that a plan fiduciary might find a reasonable rate for RKA services, just as there are many reasons why a fiduciary might reasonably conclude that it is more prudent to keep a known provider than transition to a new one at a lower price.  In short, "assertions that the investment committee failed to conduct periodic requests for proposal and to renegotiate [RKA fees] . . . do not cause the Court to draw an inference that the investment committee acted imprudently."  *Riley v. Olin Corp.*, No. 4:21-CV-01328-SRC, 2022 WL 2208953, at *5 (E.D. Mo. June 21, 2022).  Accordingly, the Court will dismiss Miller's recordkeeping claim in Count 1.

**B. Imprudent Investment Options (Count 2)**

An ERISA plan fiduciary has a continuing duty to "select initial investment options with care, to monitor plan investments, and to remove imprudent ones." *TriHealth*, 40 F.4th at 448. "The focus is on each administrator's real-time decision-making process, not on whether any one investment performed well in hindsight." *Id.* The Court must examine "'the circumstances as they reasonably appear to [the fiduciary] at the time when he does the act and not at some subsequent time when his conduct is called into question.'" *Id.* (quoting Restatement (Second) of Trusts § 174 cmt. b (Am. L. Inst. 1959)).

A claim challenging the prudence of a plan administrator's decision-making process requires "'careful, context-sensitive scrutiny'" in order to 'weed[] out meritless claims.'" *Id.* at 448 (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). Courts must "'give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise.'" *Id.* (quoting *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022)).

As evidence of Defendants' failure to comply with their duty of prudence, Miller alleges that Defendants offered investment options with managed investment fees that were higher than comparable options available in the market. For instance, in the following chart ("Table 2"), Miller compares six funds offered by the Plan to other funds with lower investment fees:

| | Defendants' Investment | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| DDFIX | Invesco Diversified Dividend R5 | 0.54% | 0.10% | 0.44% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 57% |
| - | Boston Partners Large Cap Value Fund Class D | 0.42% | 0.00% | 0.42% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 50% |
| RERGX | EuroPacific Growth Fund | 0.49% | 0.00% | 0.49% | VWILX | Vanguard International Growth Adm | 0.32% | 0.00% | 0.32% | 53% |
| LSVNX | Loomis Sayles Value Fund | 0.57% | 0.00% | 0.57% | RMFGX | American Funds American Mutual R6 | 0.28% | 0.00% | 0.28% | 104% |
| FBNRX | Templeton Global Bond Fund R6 | 0.57% | 0.00% | 0.57% | DODLX | Dodge & Cox Global Bond | 0.45% | 0.08% | 0.37% | 54% |
| MVSSX | Victory-Integrity Small Cap Value Fund R6 | 0.96% | 0.00% | 0.96% | FRCSX | Franklin Small Cap Value R6 | 0.63% | 0.00% | 0.63% | 52% |
| | Average | 0.59% | 0.02% | 0.58% | | Average | 0.37% | 0.01% | 0.36% | 61.71% |

(Am. Compl. ¶ 178.)

Miller alleges that the six alternatives in Table 2 above were in the same "Morningstar category" as the corresponding options in the Plan, and that the alternatives had better Morningstar ratings, as reflected in the following chart ("Table 3"):

| Ticker | Fund Name | Morningstar Category | Morningstar Rating Overall | Morningstar Rating 3 Yr | Morningstar Rating 5 Yr | Morningstar Rating 10 Yr |
|---|---|---|---|---|---|---|
| DDFIX | Invesco Diversified Dividend R5 | US Fund Large Value | 3 | 2 | 2 | 3 |
| RMFGX | American Funds American Mutual R6 | US Fund Large Value | 5 | 4 | 5 | 5 |
| | | | | | | |
| RERGX | American Funds Europacific Growth R6 | US Fund Foreign Large Growth | 3 | 3 | 3 | 3 |
| VWILX | Vanguard International Growth Adm | US Fund Foreign Large Growth | 5 | 5 | 5 | 5 |
| | | | | | | |
| FBNRX | Templeton Global Bond R6 | US Fund Global Bond | 2 | 2 | 2 | 4 |
| DODLX | Dodge & Cox Global Bond I | US Fund Global Bond | 5 | 5 | 5 | - |
| | | | | | | |
| MVSSX | Victory Integrity Small-Cap Value R6 | US Fund Small Value | 2 | 2 | 2 | 3 |
| FRCSX | Franklin Small Cap Value R6 | US Fund Small Value | 4 | 4 | 4 | 4 |

(Am. Compl. ¶ 177.)

In addition, the three investment options in the following chart ("Table 4") were allegedly available in different share classes with lower overall expense ratios, after accounting for revenue sharing:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | Defendants' Plan's Investment Excessive Fees (%) |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | |
| DDFIX | Invesco Diversified Dividend RS | 0.54% | 0.10% | 0.44% | LCEIX | Invesco Diversified Dividend Investor | 0.78% | 0.50% | 0.28% | 57% |
| MWTSX | Metropolitan West Total Return Bond Fund | 0.37% | 0.00% | 0.37% | MWTNX | Metropolitan West Total Return Bd Admin | 0.78% | 0.50% | 0.28% | 32% |
| MVSSX | Victory-Integrity Small Cap Value Fund R6 | 0.96% | 0.00% | 0.96% | VSVIX | Victory Integrity Small-Cap Value Y | 1.08% | 0.25% | 0.83% | 16% |
| | *Average* | *0.62%* | *0.03%* | *0.59%* | | *Average* | *0.88%* | *0.42%* | *0.46%* | *34.98%* |

(Am. Compl. ¶ 151.)  In short, Miller contends that Defendants' selection of, or failure to remove, higher cost investment options in favor of those with lower costs is evidence of Defendants' breach of their fiduciary duties.

### 1. Standing

Defendants argue that Miller lacks standing to bring his claim regarding imprudent investment options because he did not invest in most of the allegedly imprudent options.  Miller alleges that he invested in the following: "State Street Target Retirement Date 2020 and 2025 Funds, PCA Common Stock Fund, and EuroPacific Growth Fund." (Am. Compl. ¶ 21.)  Thus, of the seven investment options listed in Tables 2 and 4 above, Miller invested in only one of them, the EuroPacific Growth Fund.  And as to that fund, Miller does not allege any specific facts about its performance or expenses in 2016, the year that he was a participant.  His complaint does not indicate the relevant dates for the data in the charts above.  Instead, he broadly alleges that the investment options in his charts were offered "during the Class Period," i.e., "March 23, 2016, through the date of judgment[.]" (Am. Compl. ¶¶ 6, 151, 177.)  Thus, to the extent Miller challenges the selection of the EuroPacific Growth Fund, Defendants argue that his allegations are insufficient to plausibly show that this option was an imprudent option in 2016, the year that Miller held it.

17

Defendants' standing argument is not persuasive.  At issue in Miller's claim is whether Defendants were fulfilling their duty of prudence when evaluating the investment options offered to plan participants.  Miller selected one such allegedly imprudent option in 2016.  Under his theory, his injury is the difference between the value of his investment with the allegedly excessive investment expenses and the value of his investment with the lower expenses that a more prudent investment option would have charged.  That injury is sufficient to establish standing.

As to Defendants' argument that Miller failed to allege facts about the EuroPacific Growth Fund in 2016, Defendants' brief makes clear that Miller's allegation about the expense ratio for that fund derives from publicly available data from 2016.  (*See* Defs.' Br., Table 1, Summary of Plan Investment Options, ECF No. 29, PageID.592.)[5]  In that year, the expense ratio for the EuroPacific Growth Fund was 0.49%, which is the same number in Miller's chart.  (*See id.*)

Although Miller did not personally invest in all of the funds with allegedly excessive fees, he has standing to pursue a fiduciary duty claim involving those other funds.[6]  The district court in *CommonSpirit* concluded that plaintiff's "investment in one of the challenged funds is sufficient to confer standing to sue on behalf of plan members who invested in the remaining challenged funds. 'Courts have recognized that a plaintiff with Article III standing may proceed under § 1132(a)(2) on behalf of the plan or other participants.'"  *Smith v. CommonSpirit Health*, No. CV 20-95-DLB-EBA, 2021 WL 4097052, at *4 (E.D. Ky. Sept. 8, 2021), *aff'd*, 37 F.4th 1160 (6th Cir. 2022) (quoting *Braden v. Wal-Mart, Inc.*, 588 F.3d 585, 593 (8th Cir. 2009)); *accord Iannone*

---

[5] Defendants' chart contains data from the Plan's annual fee disclosure statements, which are attached to their motion. The Court consider these statements because they are mentioned in the complaint and are central to Miller's claims. (*See* Am. Compl. ¶¶ 53, 191.)

[6] That said, the Court is not persuaded that Miller has standing to sue for a breach of fiduciary duty that occurred after 2016, when he was no longer a Plan participant and presumably held no assets in the Plan.  However, the parties have not adequately addressed that issue in their briefing, and the Court need not resolve it in order to decide Defendants' motion.

*v. AutoZone, Inc.*, No. 19-CV-2779-MSN-TMP, 2022 WL 5432740, at *7 (W.D. Tenn. Aug. 12, 2022) ("The majority of district courts within the Sixth Circuit have [held] that once a putative class representative establishes Article III standing, they may proceed under § 1132(a)(2) on behalf of the plan or other participants."), *report and recommendation adopted*, 2022 WL 17485953 (W.D. Tenn. Dec. 7, 2022).

Indeed, Defendants acknowledge in their reply brief that their standing argument is *not* based on Miller's failure to invest in all the challenged funds. (Defs.' Reply Br. 3, ECF No. 31 ("PCA does not contend that Plaintiff lacks standing because he did not invest in each of the challenged funds. Rather, Plaintiff fails to allege standing with respect to *any* challenged fund or service.").) In other words, Defendants are *not* claiming that Miller lacks standing to challenge the propriety of funds in which he did not invest. Instead, they are claiming he lacks standing to pursue *any* claims because his allegations are insufficient to state a claim. (*Id.*) That argument goes to the merits of Miller's claim, which the Court will address in the next section.

### 2. Merits

As indicated, Miller claims that Defendants selected investment options that were more expensive than comparable alternatives available in the market. "Plan administrators . . . have considerable discretion in choosing their offerings and do not have to pick the lowest-cost fund of a certain type where the long-run performance of another fund had the reasonable prospect of surpassing it." *TriHealth*, 40 F.4th at 449. To make a meaningful comparison between the fund offered by the Plan and an alternative option, Miller must account for, among other things, the distinct goals and distinct strategies of various investment options. *Id.* "A side-by-side comparison of how two funds performed in a narrow window of time, with no consideration of their distinct objectives, will not tell a fiduciary which is the more prudent long-term investment option." *CommonSpirit*, 37 F.4th at 1167. Accordingly, "[t]he plaintiff . . . must do the work of

19

showing that the comparator investment has sufficient parallels to prove a breach of fiduciary duty." *TriHealth*, 40 F.4th at 451.

Here, Miller alleges that each of the less expense investment options in Table 2 were in the same "Morningstar Investment category" as the corresponding options that were available through the Plan. (Am. Compl. ¶ 175.)  A Morningstar category "is a way to group investments based on similar risk, return, and behavior profiles." Category (Aug. 12, 2021), https://www.morningstar.com/investing-definitions/category.

Defendants argue that Miller's allegations do not provide sufficient context to make apples-to-apples comparisons; however, other courts have accepted reliance on Morningstar categories as a meaningful benchmark to make comparisons at the pleading stage.  *See, e.g.*, *Gaines v. Tse*, No. 22 C 1878, 2023 WL 2587811, at *5 (N.D. Ill. Mar. 21, 2023); *Parker v. GKN N. Am. Servs.*, Inc., No. 21-12468, 2022 WL 15142598, at *4 (E.D. Mich. Oct. 26, 2022); *Moler v. Univ. of Maryland Med. Sys.*, No. 1:21-CV-01824-JRR, 2022 WL 2756290, at *3 (D. Md. July 13, 2022). *But see Riley v. Olin Corp.*, No. 4:21-cv-01328-SRC, 2023 WL 371872 (E.D. Mo. Jan. 24, 2023) (rejecting Morningstar categories for purposes of comparing fund performance).  This Court will do the same.

Defendants also argue that the Court of Appeals requires "serious signs of distress to allow an imprudence claim to proceed."  *CommonSpirit*, 37 F.4th at 1168.  But there, the court was referring to a claim that was based primarily on the performance and "reputation" of the fund.  *Id.* In contrast, Miller alleges that the Plan selected funds with higher costs than comparators. Whereas the future performance of a fund is difficult to predict and will therefore require "serious signs of distress" before it becomes imprudent to keep it in a plan, a fund with a higher expense

ratio than a close comparator is more likely to "guarantee[] worse returns" in the future.  *See TriHealth*, 40 F.4th at 451 (emphasis omitted).  Thus, Defendants' argument is inapt.

In addition, Defendants note that the Plan removed some of the challenged funds after several years, undercutting Miller's claim that there was a defective process in selecting investment options.  (*See* Defs.' Br., Table 1.)  For instance, the Plan replaced the Metropolitan West Total Return Bond Fund in 2019, and it replaced the Templeton Global Bond R6 Fund in 2021.  (*Id.*)  Nevertheless, the Court concludes that Miller's allegations are adequate to state a plausible claim.

As to Miller's allegations about alternative options available in different share classes, Defendants note that the expense ratios of the alternatives were *higher* than the corresponding expense ratios of the share classes offered through the Plan.  (*See* Table 4, above.)  All else being equal, selecting a share class with a higher expense ratio would not be a prudent decision.

However, Miller contends that the alternative share classes were more prudent options because their *net* expenses were lower after accounting for revenue sharing.

> Revenue sharing is one way that retirement plans cover the costs of plan administration.  Mutual funds pay back a portion of the fees that they charge investors in the plan because the plan or a third party handles recordkeeping and administration services that the mutual fund would otherwise cover.  Revenue sharing is generally charged as a proportion of fund assets and can serve as an alternative to a flat recordkeeping fee charged to plan participants for administrative costs.

*TriHealth*, 40 F.4th at 452 (citations omitted).  In dicta, the Court of Appeals for the Sixth Circuit noted that revenue sharing could

> justify the increased expense ratio of [other] shares [where] it covers recordkeeping costs that participants would otherwise have to pay separately, and in some cases plans could even pass along part of these revenue sharing payments back to participants as a rebate.

*Id.*

But the Court of Appeals for the Seventh Circuit rejected a similar theory in *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022).  There, the court first noted that the Form 5500

> does not require plans to disclose precisely where money from revenue sharing goes.  Some revenue sharing proceeds go to the recordkeeper in the form of profits, and some go back to the investor, but there is not necessarily a one-to-one correlation such that revenue sharing always redounds to the investors' benefit.

*Id.* at 581.  The court also noted that the theory was a "novel" one, as it could not find any cases crediting the idea that a fiduciary could be imprudent for not selecting an alternative with lower expenses after accounting for revenue sharing.  *Id.* at 581.  And "[w]hile a prudent fiduciary might consider such a metric, no court has said that ERISA *requires* a fiduciary to choose an investment option on this basis."  *Id.*  Consequently, the court "saw no reason to impose" that requirement in that particular case.  *Id.*

Here, the Court has already concluded that Miller has stated a plausible claim insofar as he alleges that Defendants failed to comply with their duty of prudence in connection with the selection and monitoring of investment options.  Miller's allegations about alternative share classes are simply additional facts to support the same claim.  And at the end of the day, Defendants' decision-making process is the focus of Miller's fiduciary duty claim, rather than the particular funds Defendants chose.  Thus, the Court will not dismiss this aspect of the claim.

### C. Managed Account Services (Count 3)

Miller alleges that Defendants retained Alight's subsidiary, Alight Financial Advisors ("AFA"), to provide managed account services to participants of the Plan in exchange for an annual fee that was higher than fees charged for similar services for participants of "similarly situated" plans.  (Am. Compl. ¶ 195.)  Miller alleges that such service providers are "materially identical at the mega plan level."  (*Id.* ¶ 199.)  All of them offer to help participants "create an investment strategy," and they all provide participants "fiduciary investment services."  (*Id.* ¶ 200.)

For instance, AFA provided an online tool to help participants in the Plan "fine-tune [their] investing strategy." (*Id.*) And through its "Professional Management program," it provided "personalized portfolio management from professional investment advisors." (*Id.*) Miller contends that the latter program "added no material value" to warrant additional fees. (*Id.* ¶ 204.)

### 1. Standing

Defendants argue that Miller lacks standing to pursue a claim regarding the management account services because he does not allege any injury. He does not allege that he paid any fees for managed account services. Miller does not respond to this argument; thus, he has forfeited the issue. Further, absent injury, the Court cannot discern a basis for Miller to pursue such a claim. He has no concrete stake in the matter.

### 2. Merits

Even assuming that Miller had standing to pursue this claim, it suffers from the same problems as Miller's claim regarding RKA fees. Miller provides a list of "similarly situated" plans and the managed account services fee charged by those plans. (*See id.* ¶ 195.) But he provides no details about those other plans to support his assertion that they are similarly situated. He also alleges that managed account services provided to mega plans are materially identical, but that allegation is conclusory because it is unsupported by any facts. Accordingly, the Court will dismiss Count 3 of the complaint.

### D. Failure to Monitor (Counts 4 - 6)

As noted by Defendants, Counts 4 to 6 are derivative of Counts 1 to 3. For example, in Count 1, Miller claims that the Committee Defendants did not fulfill their fiduciary duties with respect to the RKA fees. In Count 4, Miller claims that PCA and the Board failed to adequately monitor the Committee Defendants to ensure that they were fulfilling their duties with respect to RKA fees. (*See* Am. Compl. ¶¶ 264-66.)

Because Miller fails to state a claim in Count 1 regarding RKA fees, he necessarily fails to state a claim in Count 4 regarding PCA and the Board Defendants' alleged failure to monitor the Committee Defendants.  *See Dover v. Yanfeng US Auto. Interior Sys. I LLC*, 563 F. Supp. 3d 678, 690 (E.D. Mich. 2021) ("Because a claim that certain Defendants failed to monitor the imprudent or disloyal actions of others requires a preliminary finding of breach of those duties, courts generally treat a 'failure to monitor' claim as rising or falling with a breach of duty claim.").

Similarly, in Count 3, Miller claims that the Committee Defendants breached their fiduciary duty when selecting an excessive fee for managed account services, and in Count 6, Miller claims that PCA and the Board Defendants did not fulfill their duty to monitor the Committee Defendants with respect to the managed account services fee.  (*See* Am. Compl. ¶¶ 278-80.)  Because Miller lacks standing and fails to state a claim in Count 3, he necessarily lacks standing and fails to state a claim in Count 6.  Therefore, the Court will dismiss Counts 4 and 6.  But because the Court will not be dismissing Count 2, the Court will not dismiss Count 5.

### E. Board & Individual Defendants

#### 1. Individual Defendants as Fiduciaries

Defendants argue that the Court should dismiss the individual defendants because Miller has not alleged facts indicating that they are fiduciaries of the Plan.  There are two types of fiduciaries under ERISA:  (1) "named" fiduciaries, who are designated in the written instrument that govern the plan, 29 U.S.C. § 1102(a); and (2) "functional" fiduciaries, who are fiduciaries to the extent they exercise or have "any discretionary authority or discretionary responsibility in the administration" of the plan.  29 U.S.C., § 1002(21)(A).

Here, the Plan documents identify the "Benefits Administration Committee" as the "named fiduciary" for purposes of "administering and operating" the Plan, and the "Investment Committee" as the "named fiduciary" for purposes of "Plan investment."  (Plan §§ 8.1, 9.1, ECF

No. 11-2.)  The Board of Directors had the authority to appoint the members of the Investment Committee.  (*Id.* § 9.1.)  Miller alleges that the Board Defendants also had the authority to remove members of the Committee and therefore had a responsibility to monitor those members to ensure that they were fulfilling their fiduciary duties.  (Am. Compl. ¶¶ 263-64.)  *See In re AEP ERISA Litig.*, 327 F. Supp. 2d 812, 832 (S.D. Ohio 2004) ("There can be no doubt that the ERISA statutory scheme imposes a duty to monitor upon fiduciaries when they appoint other persons to make decisions about the plan.").

Defendants argue that the individual members of the Board and the Investment Committee are not fiduciaries merely because they were members of those entities.  *See Confer v. Custom Eng'g Co.*, 952 F.2d 34, 37 (3d Cir. 1991) ("[W]hen an ERISA plan names a corporation as a fiduciary, the officers who exercise discretion on behalf of that corporation are not fiduciaries . . . , unless it can be shown that these officers have *individual* discretionary roles as to plan administration.").  That may be so, but the individual Committee Defendants' membership in the Investment Committee, which is a named fiduciary, is sufficient at this stage to make a plausible inference that they had individual discretionary authority over investment decisions for the Plan.  Likewise, the individual Board Defendants' membership in the Board of Directors, which had authority to appoint members of the Committee, is sufficient to make a plausible inference that they had a fiduciary duty to monitor the members of the Investment Committee.

*Confer* is distinguishable because it decided the issue at the summary judgment stage, not at the stage where the Court assesses the allegations of the complaint.  "'Because [f]iduciary status is a fact sensitive inquiry,' at the motion to dismiss stage, 'courts generally do not dismiss claims . . . where the complaint sufficiently pleads defendants' ERISA fiduciary status.'"  *Peters v. Aetna, Inc.*, No. 1:15-cv-00109-MR, 2016 WL 4547151, at *10 (W.D.N.C. Aug. 31, 2016)

(quoting *In re Schering-Plough Corp. ERISA Litig.*, No. 03-1204 (KSH), 2007 WL 2374989, at

*7 (D.N.J. Aug. 15, 2007)).   Also, as to the Board Defendants, none of the cases cited by

Defendants address the theory that Miller raises here, which is that board members with authority

to appoint and/or remove Plan fiduciaries have a fiduciary duty to monitor the conduct of those

fiduciaries.

### 2. Unnecessary Defendants

Next, Defendants argue that the Court should dismiss the Board and the individual

defendants because asserting claims against them is "legally improper."  (Defs.' Br. 30.)  The

individual defendants served on either the PCA's Board of Directors or its Investment Committee.

Defendants argue that asserting claims against the individual defendants "serves no legitimate

purpose" where the Board of Directors and the Investment Committee are named as separate

defendants.  (*Id.*)  According to Defendants, naming the individuals as defendants does not change

the scope of discovery or the relief available to Miller.  In addition, Defendants argue that there is

no reason to sue the PCA's Board of Directors when the PCA is a defendant; such a claim is

"duplicative."  (Defs.' Reply Br. 31, ECF No. 31.)

Defendants cite no authority for dismissal of a defendant because that defendant is

purportedly unnecessary for obtaining discovery or relief on the merits.  Furthermore, although

Defendants apparently contend that the Board of Directors and the Investment Committee can

stand in the place of their individual members, it is not clear to the Court that the Board or the

Investment Committee are distinct entities capable of being sued.   Unlike PCA, which is a

corporation, it is not clear that those entities have a separate legal status apart from their members.

Nor is it clear that PCA, the Board, or the Investment Committee would be liable for a breach of

fiduciary duty in the same manner as the individual defendants.  Thus, the Court is not persuaded

that naming the PCA, the Board, and the Investment Committee makes it unnecessary to keep the individual defendants in this action.[7]  Consequently, the Court will not dismiss any Defendants.

## IV. CONCLUSION

For the reasons herein, the Court will grant Defendants' motion in part and deny it in part. The Court will dismiss Counts 1, 3, 4, and 6 of the amended complaint.  Counts 2 and 5 will remain.

The Court will enter an order that is consistent with this Opinion.


Dated: March 30, 2023                                    /s/ Hala Y. Jarbou
                                                        HALA Y. JARBOU
                                                        CHIEF UNITED STATES DISTRICT JUDGE

---

[7] Defendants also assert that, contrary to the complaint, Defendant Mundy never served as a member of the Investment Committee.  (Defs.' Br. 30 n.13.)  At this stage, however, the Court must accept the well-pleaded factual allegations in the complaint as true.  The Court cannot credit Defendants' assertion in their brief.